PERKINS, SECRETARY OF LABOR, ET AL. *v.* ELG.*

No. 454.  Argued February 3, 1939.—Decided May 29, 1939.

---

* Together with No. 455, *Elg* v. *Perkins, Secretary of Labor, et al.*, also on writ of certiorari to the Court of Appeals for the District of Columbia.

326

Mr. *Henry F. Butler* for Elg.

*Solicitor General Jackson*, with whom *Assistant Attorney General McMahon*, and *Messrs. William W. Barron, William J. Connor*, and *Green H. Hackworth* were on the brief, for Perkins, Secretary of Labor, et al.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The question is whether the plaintiff, Marie Elizabeth Elg, who was born in the United States of Swedish parents then naturalized here, has lost her citizenship and is subject to deportation because of her removal during minority to Sweden, it appearing that her parents resumed their citizenship in that country but that she returned here on attaining majority with intention to remain and to maintain her citizenship in the United States.

Miss Elg was born in Brooklyn, New York, on October 2, 1907. Her parents, who were natives of Sweden, emigrated to the United States sometime prior to 1906 and her father was naturalized here in that year. In 1911, her mother took her to Sweden where she continued to reside until September 7, 1929. Her father went to Sweden in 1922 and has not since returned to the United States. In November, 1934, he made a statement before an American consul in Sweden that he had voluntarily expatriated himself for the reason that he did not desire to retain the status of an American citizen and wished to preserve his allegiance to Sweden.

In 1928, shortly before Miss Elg became twenty-one years of age, she inquired of an American consul in Sweden about returning to the United States and was informed that if she returned after attaining majority she should seek an American passport. In 1929, within eight months after attaining majority, she obtained an American passport which was issued on the instructions of the Secretary of State. She then returned to the United States, was admitted as a citizen and has resided in this country ever since.

In April, 1935, Miss Elg was notified by the Department of Labor that she was an alien illegally in the United States and was threatened with deportation. Proceedings to effect her deportation have been postponed from time to time. In July, 1936, she applied for an American passport but it was refused by the Secretary of State upon the sole ground that he was without authority to issue it because she was not a citizen of the United States.

Thereupon she began this suit against the Secretary of Labor, the Acting Commissioner of Immigration and Naturalization, and the Secretary of State to obtain (1) a declaratory judgment that she is a citizen of the United States and entitled to all the rights and privileges of citizenship, and (2) an injunction against the Secretary of Labor and the Commissioner of Immigration restraining them from prosecuting proceedings for her deportation, and (3) an injunction against the Secretary of State from refusing to issue to her a passport upon the ground that she is not a citizen.

The defendants moved to dismiss the complaint, asserting that plaintiff was not a citizen of the United States by virtue of the Naturalization Convention and Protocol of 1869 (proclaimed in 1872) between the United States and Sweden (17 Stat. 809) and the Swedish Nationality Law, and § 2 of the Act of Congress of March 2, 1907, 8 U. S. C. 17. The District Court overruled the motion as to the Secretary of Labor and the Commissioner of Immigration and entered a decree declaring that the plaintiff is a native citizen of the United States but directing that the complaint be dismissed as to the Secretary of State because of his official discretion in the issue of passports. On cross appeals, the Court of Appeals affirmed the decree. 69 App. D. C. 175; 99 F. 2d 408. Certiorari was granted, December 5, 1938.

*First.* On her birth in New York, the plaintiff became a citizen of the United States. Civil Rights Act of 1866,

14 Stat. 27; Fourteenth Amendment, § 1; *United States v. Wong Kim Ark*, 169 U. S. 649. In a comprehensive review of the principles and authorities governing the decision in that case—that a child born here of alien parentage becomes a citizen of the United States—the Court adverted to the "inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship." *United States v. Wong Kim Ark, supra,* p. 668. As municipal law determines how citizenship may be acquired, it follows that persons may have a dual nationality.[1] And the mere fact that the plaintiff may have acquired Swedish citizenship by virtue of the operation of Swedish law, on the resumption of that citizenship by her parents, does not compel the conclusion that she has lost her own citizenship acquired under our law. As at birth she became a citizen of the United States, that citizenship must be deemed to continue unless she has been deprived of it through the operation of a treaty or congressional enactment or by her voluntary action in conformity with applicable legal principles.

*Second.* It has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties.[2]

[1] Oppenheim's International Law, Vol. 1, § 308; Moore, International Law Digest, Vol. III, p. 518; Hyde, International Law, Vol. I, § 372; Flournoy, Dual Nationality and Election, 30 Yale Law Journal, 546; Borchard, Diplomatic Protection of Citizens Abroad, § 253; Van Dyne, Citizenship of the United States, p. 25; Fenwick, International Law, p. 165.

[2] Hyde, *op. cit.,* §§ 374, 375; Borchard, *op. cit.,* § 259; Van Dyne, *op. cit.,* pp. 25–31; Moore, Int. Law Dig., Vol. III, pp. 532–551.

330

This principle was clearly stated by Attorney General Edwards Pierrepont in his letter of advice to the Secretary of State, Hamilton Fish, in *Steinkauler's Case,* 15 Op. Attys. Gen'l, 15 (1875). The facts were these: One Steinkauler, a Prussian subject by birth, emigrated to the United States in 1848, was naturalized in 1854, and in the following year had a son who was born in St. Louis. Four years later Steinkauler returned to Germany taking this child and became domiciled at Wiesbaden where they continuously resided. When the son reached the age of twenty years the German Government called upon him to report for military duty and his father then invoked the intervention of the American Legation on the ground that his son was a native citizen of the United States. To an inquiry by our Minister, the father declined to give an assurance that the son would return to this country within a reasonable time. On reviewing the pertinent points in the case, including the Naturalization Treaty of 1868 with North Germany, the Attorney General reached the following conclusion:

"Young Steinkauler is a native-born American citizen. There is no law of the United States under which his father or any other person can deprive him of his birthright. He can return to America at the age of twenty-one, and in due time, if the people elect, he can become President of the United States; but the father, in accordance with the treaty and the laws, has renounced his American citizenship and his American allegiance and has acquired for himself and his son German citizenship and the rights which it carries, and he must take the burdens as well as the advantages. The son being domiciled with the father and subject to him under the law during his minority, and receiving the German protection where he has acquired nationality and declining to give any assurance of ever returning to the United States and claiming his American nationality by residence here, I am of opinion that he cannot rightly invoke the aid of

the Government of the United States to relieve him from military duty in Germany during his minority. But I am of opinion that when he reaches the age of twenty-one years he can then elect whether he will return and take the nationality of his birth, with its duties and privileges, or retain the nationality acquired by the act of his father. This seems to me to be 'right reason', and I think it is law."

Secretary William M. Evarts, in 1879, in an instruction to our Minister to Germany with respect to the status of the brothers Boisseliers who were born in the United States of German parentage said: [3]

"Their rights rest on the organic law of the United States. . . . Their father, it is true, took them to Schleswig when they were quite young, the one four and the other two years old. They lived there many years, but during all those years they were minors, and during their minority they returned to the United States; and now, when both have attained their majority, they declare for their native allegiance and submit themselves to the jurisdiction of the country where they were born and of which they are native citizens. Under these circumstances this Government cannot recognize any claim to their allegiance, or their liability to military service, put forth on the part of Germany, whatever may be the municipal law of Germany under which such claim may be asserted by that Government."

Secretary Evarts gave a similar instruction in 1880 with respect to a native citizen of Danish parentage who having been taken abroad at an early age claimed American citizenship on attaining his majority, saying: [4]

"He lost no time, when he attained the age of majority, in declaring that he claimed the United States as his country, and that he considered himself a citizen of

---

[3] Moore, Int. Law Dig., Vol. III, p. 543.
[4] Moore, Int. Law. Dig., Vol. III, p. 544.

332

the United States. He appears to have adhered to this choice ever since, and now declares it to be his intention to return to this country and reside here permanently. His father's political status (whether a citizen of the United States or a Danish subject) has no legal or otherwise material effect on the younger P————s' rights of citizenship."

Secretary Thomas F. Bayard, in answer to an inquiry by the Netherlands Legation whether one born in the United States, of Dutch parents, who during minority had been taken back to the Netherlands by his father, on the latter's resumption of permanent residence there, was an American citizen, answered: [5]

"But the general view held by this Department is that a naturalized American citizen by abandonment of his allegiance and residence in this country and a return to the country of his birth, *animo manendi*, ceases to be a citizen of the United States; and that the minor son of a party described as aforesaid, who was born in the United States during the citizenship there of his father, partakes during his legal infancy of his father's domicile, but upon becoming *sui juris* has the right to elect his American citizenship, which will be best evidenced by an early return to this country.

"This right so to elect to return to the land of his birth and assume his American citizenship could not, with the acquiescence of this Government, be impaired or interfered with."

In 1906, a memorandum, prepared in the Department of State by its law officer, was sent by the Acting Secretary of State, Robert Bacon, to the German Ambassador

[5] Foreign Relations, 1888, Pt. 2, p. 1341. See, also, Mr. Bayard, Secretary of State to Mr. McLane (1888), to Count Sponneck, Danish Minister (1888); Moore, Int. Law Dig., Vol. III, p. 548; Mr. Olney, Secretary of State, to Mr. Materne, 1896; Moore, Int. Law Dig., Vol. III, p. 542; *United States ex rel. Scimeca* v. *Husband*, 6 F. 2d 957, 958.

as covering "the principles" upon which the Department had acted. In this memorandum it was said: [6]

"Assuming that Alexander Bohn [the father] never became a citizen of the United States, Jacob Bohn [the son] was born of German parents in the United States. According to the Constitution and laws of the United States as interpreted by the courts, a child born to alien parents in the United States is an American citizen, although such child may also be a citizen of the country of his parents according to the law of that country.

"Although there is no express provision in the law of the United States giving election of citizenship in such cases, this department has always held in such circumstances that if a child is born of foreign parents in the United States, and is taken during minority to the country of his parents, such child upon arriving of age, or within a reasonable time thereafter, must make election between the citizenship which is his by birth and the citizenship which is his by parentage. In case a person so circumstanced elects American citizenship he must, unless in extraordinary circumstances, in order to render his election effective, manifest an intention in good faith to return with all convenient speed to the United States and assume the duties of citizenship." [7]

We have quoted liberally from these rulings—and many others might be cited—in view of the contention now urged by the petitioners in resisting Miss Elg's claim to citizenship. We think that they leave no doubt of the controlling principle long recognized by this Government.

---

[6] Foreign Relations, 1906, p. 657. See, also, "Compilation of Certain Departmental Circulars" relating to citizenship, etc., issued by Department of State, 1925, containing instructions to Diplomatic and Consular Officers under date of November 24, 1923, pp. 118, 121, 122; *United States ex rel. Baglivo* v. *Day*, 28 F. 2d 44.

[7] See also, Mr. Uhl, Acting Secretary of State to Mr. Rudolph, May 22, 1895, 202 MS. Dom. Let. 298; Moore, Int. Law Dig., Vol. III, p. 534.

That principle, while administratively applied, cannot properly be regarded as a departmental creation independently of the law. It was deemed to be a necessary consequence of the constitutional provision by which persons born within the United States and subject to its jurisdiction become citizens of the United States. To cause a loss of that citizenship in the absence of treaty or statute having that effect, there must be voluntary action and such action cannot be attributed to an infant whose removal to another country is beyond his control and who during minority is incapable of a binding choice.

Petitioners stress the American doctrine relating to expatriation. By the Act of July 27, 1868,[8] Congress declared that "the right of expatriation is a natural and inherent right of all people." Expatriation is the voluntary renunciation or abandonment of nationality and allegiance.[9] It has no application to the removal from this country of a native citizen during minority. In such a case the voluntary action which is of the essence of the right of expatriation is lacking. That right is fittingly recognized where a child born here, who may be, or may become, subject to a dual nationality, elects on attaining majority citizenship in the country to which he has been removed. But there is no basis for invoking the doctrine of expatriation where a native citizen who is removed to his parents' country of origin during minority returns here on his majority and elects to remain and to maintain his American citizenship. Instead of being inconsistent with the right of expatriation, the principle which permits that election conserves and applies it.

The question then is whether this well recognized right of election has been destroyed by treaty or statute.

[8] 15 Stat. 223.

[9] Van Dyne, *op. cit.*, p. 269; Borchard, *op. cit.*, § 315; Hyde, *op. cit.*, § 376.

*Third.* Petitioners invoke our treaty with Sweden of 1869.[10] This treaty was one of a series of naturalization treaties with similar terms, which were negotiated with various countries between 1868 and 1872.[11] The relevant portions of the text of the treaty with Sweden, and of the accompanying protocol, are set forth in the margin.[12]

---

[10] 17 Stat. 809.

[11] North German Confederation, 1868, 15 Stat. 615; Bavaria, 1868, 15 Stat. 661; Baden, 1868, 16 Stat. 731; Württemberg, 1868, 16 Stat. 735; Hesse, 1868, 16 Stat. 743; Belgium, 1868, 16 Stat. 747; Great Britain, 1870, 16 Stat. 775; Austria-Hungary, 1870, 17 Stat. 833; Denmark, 1872, 17 Stat. 941. See Flournoy and Hudson, Nationality Laws, pp. 661–673; Moore, Int. Law Dig., Vol. III, p. 358.

[12] The treaty provides:

"The President of the United States of America and His Majesty the King of Sweden and Norway, led by the wish to regulate the citizenship of those persons who emigrate from the United States of America to Sweden and Norway and their dependencies and territories, and from Sweden and Norway to the United States of America, have resolved to treat on this subject, and have for that purpose appointed plenipotentiaries to conclude a convention, . . . who have agreed to and signed the following articles:

"Article I. Citizens of the United States of America who have resided in Sweden or Norway for a continuous period of at least five years, and during such residence have become and are lawfully recognized as citizens of Sweden or Norway, shall be held by the government of the United States to be Swedish or Norwegian citizens, and shall be treated as such.

"Reciprocally, citizens of Sweden or Norway who have resided in the United States of America for a continuous period of at least five years, and during such residence have become naturalized citizens of the United States, shall be held by the government of Sweden and Norway to be American citizens, and shall be treated as such.

"The declaration of an intention to become a citizen of one or the other country has not for either party the effect of citizenship legally acquired.

"Article III. If a citizen of the one party, who has become a recognized citizen of the other party, takes up his abode once more in his original country and applies to be restored to his former citizenship,

The treaty manifestly deals with expatriation and the recognition of naturalization by the respective powers. The recital states its purpose; that is, "to regulate the citizenship of those persons who emigrate" to one country from the other. The terms of the treaty are directed to that purpose and are appropriate to the recognition of the status of those who voluntarily take up their residence for the prescribed period in the country to which they emigrate. Article I of the treaty provides:

"Citizens of the United States of America who have resided in Sweden or Norway for a continuous period of at least five years, and during such residence have become

the government of the last-named country is authorized to receive him again as a citizen on such conditions as the said government may think proper."

The protocol containing "the following observations, more exactly defining and explaining the contents" of the convention provides:

"I. Relating to the first article of the convention.

"It is understood that if a citizen of the United States of America has been discharged from his American citizenship, or, on the other side, if a Swede or a Norwegian has been discharged from his Swedish or Norwegian citizenship, in the manner legally prescribed by the government of his original country, and then in the other country in a rightful and perfectly valid manner acquires citizenship, then an additional five years' residence shall no longer be required; but a person who has in that manner been recognized as a citizen of the other country shall, from the moment thereof, be held and treated as a Swedish or Norwegian citizen, and, reciprocally, as a citizen of the United States.

.        .        .        .        .

"III. Relating to the third article of the convention.

"It is further agreed that if a Swede or Norwegian, who has become a naturalized citizen of the United States, renews his residence in Sweden or Norway without the intent to return to America, he shall be held by the government of the United States to have renounced his American citizenship.

"The intent not to return to America may be held to exist when the person so naturalized resides more than two years in Sweden or Norway."

and are lawfully recognized as citizens of Sweden or Norway, shall be held by the government of the United States to be Swedish or Norwegian citizens, and shall be treated as such.

"Reciprocally, citizens of Sweden or Norway who have resided in the United States of America for a continuous period of at least five years, and during such residence have become naturalized citizens of the United States, shall be held by the government of Sweden and Norway to be American citizens, and shall be treated as such.

"The declaration of an intention to become a citizen of one or the other country has not for either party the effect of citizenship legally acquired."

We think that this provision in its direct application clearly implies a voluntary residence and it would thus apply in the instant case to the father of respondent. There is no specific mention of minor children who have obtained citizenship by birth in the country which their parents have left. And if it be assumed that a child born in the United States would be deemed to acquire the Swedish citizenship of his parents through their return to Sweden and resumption of citizenship there,[13] still nothing is said in the treaty which in such a case would destroy the right of election which appropriately belongs to the child on attaining majority. If the abrogation of that right had been in contemplation, it would naturally have been the subject of a provision suitably explicit. Rights of citizenship are not to be destroyed by an ambiguity. Moreover, the provisions of Article III must be read in connection with Article I. Article III provides:

"If a citizen of the one party, who has become a recognized citizen of the other party, takes up his abode once more in his original country and applies to be restored to his former citizenship, the government of the last-named

---

[13] Compare Secretary Hay to Mr. Harris, Foreign Relations, 1900, p. 13.

338

country is authorized to receive him again as a citizen on such conditions as the said government may think proper."

If the first article could be taken to cover the case of a child through the derivation of citizenship from that of his emigrating parents, Article III by the same token would be applicable to the case of a child born here and taken to Sweden, who at majority elects to return to the United States and to assume the privileges and obligations of American citizenship. In that event, the Government of the United States is expressly authorized to receive one so returning "as a citizen on such conditions as the said government may think proper." And if this Government considers that a native citizen taken from the United States by his parents during minority is entitled to retain his American citizenship by electing at majority to return and reside here, there would appear to be nothing in the treaty which would gainsay the authority of the United States to recognize that privilege of election and to receive the returning native upon that basis. Thus, on the facts of the present case, the treaty does not purport to deny to the United States the right to treat respondent as a citizen of the United States, and it necessarily follows that, in the absence of such a denial, the treaty cannot be set up as a ground for refusing to accord to respondent the rights of citizenship in accordance with our Constitution and laws by virtue of her birth in the United States.

Nor do we find anything in the terms of the protocol, accompanying the treaty, which can be taken to override the right of election which respondent would otherwise possess. Article III of the protocol refers to the case of a Swede who has become a naturalized citizen of the United States and later renews his residence in Sweden "without the intent to return to America." And

it provides that the intent not to return may be held to exist when the person "so naturalized" resides more than two years in Sweden. This does not appear to be applicable to respondent, who was born in the United States, but, apart from that, the intent not to return could not properly be attributed to her during minority, and if it were so attributed, the presumption would be rebutted by the election to return to the United States at majority. Compare *United States* v. *Howe*, 231 F. 546, 549.[14]

The views we have expressed find support in the construction placed upon the naturalization treaties of 1868 to 1872[15] in the period following their ratification. The first of those treaties was made in 1868 with the North German Confederation[16] and contained provisions similar to those found in the treaty with Sweden. But it was under this German treaty that Steinkauler's case arose in 1875, to which we have already referred, where Attorney General Pierrepont upheld the right of election, saying:[17] "Under the treaty, and in harmony with the American doctrine, it is clear that Steinkauler, the father, abandoned his naturalization in America and became a German subject (his son being yet a minor), and that by virtue of German laws the son acquired German nationality. It is equally clear that the son by birth has American nationality; and hence he has two nationalities, one natural, the other acquired. . . . There is no law of

---

[14] While the nationality law of Sweden is not to be regarded as controlling unless the treaty makes it so—which we have found is not the case—it may be observed that it is not clear that the law of Sweden would operate so as to preclude recognition that respondent is a citizen of the United States. See the Swedish law of 7 May, 1909, Art. 8. That, however, is a question of foreign law which we find it unnecessary to attempt to determine.

[15] See Note 10.

[16] 15 Stat. 615. See *Terlinden* v. *Ames*, 184 U. S. 270, 283, 284.

[17] 15 Op. Attys. Gen'l. 15, 17, 18.

the United States under which his father or any other person can deprive him of his birthright." To the same effect, as to the right of election, was the ruling of Secretary Evarts in 1879 in his instruction, above quoted, to our minister to Germany with respect to the brothers Boisseliers.[18]

There were provisions similar to those in the treaty with Sweden in the naturalization treaty with Denmark of 1872,[19] but Secretary Evarts evidently did not regard those provisions as inconsistent with the claim, which he sustained, of one born here of Danish parentage who was taken abroad by his parents but insisted upon his American citizenship when he arrived at his majority.[20] These rulings, following closely upon the negotiation of these naturalization treaties, show beyond question that the treaties were not regarded as abrogating the right of election for which respondent here contends.

Later rulings were to the same effect. Thus, in 1890, in dealing with a native American citizen who, upon his own application, had been admitted to Danish citizenship during his minority, and who had not yet come of age, the Secretary of State, while recognizing that "when a citizen of the United States voluntarily becomes naturalized or renaturalized in a foreign country, he is to be regarded as having lost his rights as an American citizen," was careful to make the following qualifications in support of the right of election at majority, saying:

"As Mr. Anderson has not yet attained his majority, the Department is not prepared to admit that proceedings taken on his behalf in Denmark during his minority would deprive him of his right, upon reaching the age of twenty-one years, to elect to become an American

---

[18] Moore, Int. Law Dig., Vol. III, p. 543.

[19] 17 Stat. 941.

[20] Moore, Int. Law Dig., Vol. III, p. 544.

citizen by immediately returning to this country to resume his allegiance here." [21]

Petitioners refer to an instruction by Secretary Sherman in 1897 [22] in answer to a question as to the effect of a person's return to his native country for a visit on his rights as an American citizen which had been acquired through the naturalization of his father. While Secretary Sherman recognized "the acquisition of United States citizenship by an alien-born minor through the lawful naturalization of his father under the operation of Section 2172, Revised Statutes," the Secretary added the following:

"If such a party having thus become a recognized citizen of the United States, takes up his abode once more in his original country, and applies to be restored to his former citizenship, the government of the last named country is authorized to receive him again as a citizen, on such conditions as the said Government may think proper. (Treaty of 1869, Article III.) Or he may by residence in the country of origin, without intent to return to the United States, be held to have renounced his American citizenship. (Protocol, May 26, 1869.) But this presumption, like all presumptions of intent, may be rebutted by proof. Until a person so circumstanced shall be held to have voluntarily abandoned his American citizenship, or shall have acquired another citizenship upon application to that end and by due process of law, this Government is entitled to claim his allegiance and constrained to protect him as a citizen so long as he shall be found bona fide entitled thereto."

---

[21] Mr. Wharton, Acting Secretary of State, to Count Sponneck, Danish Minister (1890); Moore, Int. Law Dig., p. 715.

[22] Secretary Sherman to Mr. Grip, Swedish Minister, June 15, 1897; Moore, Int. Law Dig., Vol. III, p. 472; 8 MS., Notes to Sweden, 58.

We find nothing in that instruction which is inconsistent with the maintenance of respondent's right of election in the instant case. So far as the instruction in relation to a naturalized minor may be deemed to be pertinent, it confirms rather than opposes respondent's right to be considered an American citizen.

That the Department of State continued to maintain the right of election is further shown by the memorandum of applicable principles which it issued in 1906, above quoted, to the effect that the Department had "always held in such circumstances that if a child is born of foreign parents in the United States, and is taken during minority to the country of his parents, such child upon arriving of age, or within a reasonable time thereafter, must make election between the citizenship which is his by birth and the citizenship which is his by parentage." [23]

*Fourth.* We think that petitioners' contention under § 2 of the Act of March 2, 1907,[24] is equally untenable. That statutory provision is as follows:

"That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: *Provided, however,* That such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as

[23] Foreign Relations, 1906, p. 657.
[24] 34 Stat. 1228; 8 U. S. C. 17.

the Department of State may prescribe: *And provided also,* That no American citizen shall be allowed to expatriate himself when this country is at war." [25]

Petitioners contend that respondent's acquisition of derivative Swedish citizenship makes her a person who has been "naturalized under Swedish law," and that therefore "she has lost her American citizenship" through the operation of this statute. We are unable to accept that view. We think that the statute was aimed at a voluntary expatriation and we find no evidence in its terms that it was intended to destroy the right of a native citizen, removed from this country during minority, to elect to retain the citizenship acquired by birth and to return here for that purpose. If by virtue of derivation from the citizenship of one's parents a child in that situation can be deemed to have been naturalized under the foreign law, still we think in the absence of any provision to the contrary that such naturalization would not destroy the right of election.

[25] Sections 5 and 6 of this statute should also be noted as they contain provisions applicable to minor children. They are as follows:

"Sec. 5. That a child born without the United States of alien parents shall be deemed a citizen of the United States by virtue of the naturalization of or resumption of American citizenship by the parent: *Provided,* That such naturalization or resumption takes place during the minority of such child: *And provided further,* That the citizenship of such minor child shall begin at the time such minor child begins to reside permanently in the United States.

"Sec. 6. That all children born outside the limits of the United States who are citizens thereof in accordance with the provisions of section nineteen hundred and ninety-three of the Revised Statutes of the United States and who continue to reside outside the United States shall, in order to receive the protection of this Government, be required upon reaching the age of eighteen years to record at an American consulate their intention to become residents and remain citizens of the United States and shall be further required to take the oath of allegiance to the United States upon attaining their majority."

It should also be noted that the Act of 1907 in §§ 5 and 6 [26] has specific reference to children born without the United States of alien parents but says nothing as to the loss of citizenship by minor children born in the United States.

That in the latter case the child was not deemed to have lost his American citizenship by virtue of the terms of the statute but might still with reasonable promptness on attaining majority manifest his election is shown by the views expressed in the instructions issued under date of November 24, 1923, by the Department of State to the American Diplomatic and Consular Officers.[27] These instructions dealt with the questions arising under the citizenship act of March 2, 1907, and cases of dual nationality. It was stated that it was deemed desirable "to inform diplomatic and consular officers of the department's conclusions, for their guidance in handling individual cases." Commenting on dual nationality the instructions said:

"The term 'dual nationality' needs exact appreciation. It refers to the fact that two States make equal claim to the allegiance of an individual at the same time. Thus, one State may claim his allegiance because of his birth within its territory, and the other because at the time of his birth in foreign territory his parents were its nationals. The laws of the United States purport to clothe persons with American citizenship by virtue of both principles."

And after referring to the Fourteenth Amendment and the Act of February 2, 1855, R. S. 1993, the instructions continued:

---

[26] See Note 25.

[27] "Compilation of Certain Departmental Circulars" relating to citizenship, etc., issued by Department of State, 1925, containing instructions to diplomatic and consular officers under date of November 24, 1923, pp. 118, 121, 122.

"It thus becomes important to note how far these differing claims of American nationality are fairly operative with respect to persons living abroad, whether they were born abroad or were born in the United States of alien parents and taken during minority to reside in the territory of States to which the parents owed allegiance. It is logical that, while the child remains or resides in territory of the foreign State claiming him as a national, the United States should respect its claim to allegiance. The important point to observe is that the doctrine of dual allegiance ceases, in American contemplation, to be fully applicable after the child has reached adult years. Thereafter two States may in fact claim him as a national. Those claims are not, however, regarded as of equal merit, because one of the States may then justly assert that his relationship to itself as a national is, by reason of circumstances that have arisen, inconsistent with, and reasonably superior to, any claim of allegiance asserted by any other State. Ordinarily the State in which the individual retains his residence after attaining his majority has the superior claim. The statutory law of the United States affords some guidance but not all that could be desired, because it fails to announce the circumstances when the child who resides abroad within the territory of a State reasonably claiming his allegiance forfeits completely the right to perfect his inchoate right to retain American citizenship. The department must, therefore, be reluctant to declare that particular conduct on the part of a person after reaching adult years in foreign territory produces a forfeiture or something equivalent to expatriation.

"The statute does, however, make a distinction between the burden imposed upon the person born in the United States of foreign parents and the person born abroad of American parents. With respect to the latter, section 6 of the Act of March 2, 1907, lays down the requirement

that, as a condition to the protection of the United States, the individual must, upon reaching the age of 18, record at an American consulate an intention to remain a citizen of the United States, and must also take an oath of allegiance to the United States upon attaining his majority.

"The child born of foreign parents in the United States who spends his minority in the foreign country of his parents' nationality is not expressly required by any statute of the United States to make the same election as he approaches or attains his majority. It is, nevertheless, believed that his retention of a right to demand the protection of the United States should, despite the absence of statute, be dependent upon his convincing the department within a reasonable period after the attaining of his majority of an election to return to the United States, there to assume the duties of citizenship. In the absence of a definite statutory requirement, it is impossible to prescribe a limited period within which such election should be made. On the other hand, it may be asserted negatively that one who has long manifested no indication of a will to make such an election should not receive the protection of the United States save under the express approval of the department."

It thus appears that as late as 1925, when the Department issued its "Compilation" including the circular instruction of November 24, 1923, it was the view of the Department of State that the Act of March 2, 1907, had not taken away the right of a native citizen on attaining majority to retain his American citizenship, where he was born in the United States of foreign parents. We do not think that it would be a proper construction of the Act to hold that while it leaves untouched the right of election on the part of a child born in the United States, in case his parents were foreign nationals at the time of his birth and have never lost their foreign nationality, still the statute should be treated as destroying that

right of election if his parents became foreign nationals through naturalization. That would not seem to be a sensible distinction. Having regard to the plain purpose of § 2 of the Act of 1907, to deal with voluntary expatriation, we are of the opinion that its provisions do not affect the right of election, which would otherwise exist, by reason of a wholly involuntary and merely derivative naturalization in another country during minority. And, on the facts of the instant case, this view apparently obtained when in July, 1929, on the instructions of the Secretary of State, the Department issued the passport to respondent as a citizen of the United States.

But although respondent promptly made her election and took up her residence in this country accordingly, and had continued to reside here, she was notified in April, 1935, that she was an alien and was threatened with deportation.

When, precisely, there occurred a change in the departmental attitude is not clear.[28] It seems to have resulted in a conflict with the opinion of the Solicitor of the Department of Labor in the case of Ingrid Therese Tobiassen, and the Secretary of Labor because of that conflict requested the opinion of the Attorney General, which was given on June 16, 1932.[29] It appeared that Miss Tobiassen, aged 20, was born in New York in 1911; that her father, a native of Norway, became a citizen of the United States by naturalization in 1912; that in 1919 Miss Tobiassen was taken by her parents to Norway where the latter had since resided; that at the age of 18 she returned to the United States and took up her permanent residence in New Jersey. The question arose

---

[28] That there had been a change is frankly stated in the communication (a copy of which is annexed to the complaint) addressed by the American Consul at Göteborg, Sweden, to the respondent's father under date of October 29, 1935.

[29] 36 Op. Attys. Gen'l, p. 535.

348

when she asked for a return permit to visit her parents. The Department of State refused to issue a passport on the ground that Miss Tobiassen had acquired Norwegian nationality and had ceased to be an American citizen. The Attorney General's opinion approved that action.

His opinion quoted the provisions of the treaty with Sweden and Norway of 1869 [30] and referred to the Norwegian Nationality Law of August 8, 1924, and to the provisions of the Act of Congress of March 2, 1907. The opinion noted that the claim that Miss Tobiassen had ceased to be an American citizen did "not rest upon the terms of the Naturalization Treaty with Norway, but upon a law of that country, as a result of the renunciation by her father, a native of Norway, of his American citizenship, and the resumption of his Norwegian nationality in pursuance of the terms of that treaty." The law of Norway was deemed to be analogous to our statutes "by virtue of which foreign-born minor children of persons naturalized in the United States are declared to be citizens of this country"; and hence the conclusion that Miss Tobiassen having acquired Norwegian nationality had in consequence ceased to be an American citizen was said to be correct.

The opinion does not discuss the right of election of a native citizen of the United States when he becomes of age to retain American citizenship and does not refer to the repeated rulings of the Department of State in recognition of that right, the exercise of which, as we have pointed out, should not be deemed to be inconsistent with either treaty or statute. We are reluctant to disagree with the opinion of the Attorney General, and we are fully conscious of the problems incident to dual nationality and of the departmental desire to limit them,

---

[30] Cited as of June 14, 1871, the date of the exchange of ratifications.

but we are compelled to agree with the Court of Appeals in the instant case that the conclusions of that opinion are not adequately supported and are opposed to the established principles which should govern the disposition of this case.[31]

Nor do we think that recent private acts of Congress [32] for the relief of native citizens who have been the subject of administrative action denying their rights of citizenship, can be regarded as the equivalent of an Act of Congress providing that persons in the situation of the respondent here have lost the American citizenship which they acquired at birth and have since duly elected to retain. No such statute has been enacted.

We conclude that respondent has not lost her citizenship in the United States and is entitled to all the rights and privileges of that citizenship.

*Fifth.* The cross petition of Miss Elg, upon which certiorari was granted in No. 455, is addressed to the part of the decree below which dismissed the bill of complaint as against the Secretary of State. The dismissal was upon the ground that the court would not undertake by mandamus to compel the issuance of a passport or control by means of a declaratory judgment the discretion of the Secretary of State. But the Secretary of State, according to the allegation of the bill of complaint, had refused to issue a passport to Miss Elg "solely on the ground that she had lost her native born American citizenship." The court below, properly recognizing the existence of an actual controversy with the defendants

---

[31] The same may be said of the opinion of the Circuit Court of Appeals of the Ninth Circuit in *United States* v. *Reid*, 73 F. 2d 153 (certiorari denied upon the ground that the application was not made within the time provided by law, 299 U. S. 544), so far as it is urged by petitioners as applicable to the facts of the instant case.

[32] Act of July 13, 1937, 50 Stat. Pt. 2, p. 1030; Act of June 25, 1938 (Private No. 751, 75th Cong., 3d Sess.).

(*Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227), declared Miss Elg "to be a natural born citizen of the United States," and we think that the decree should include the Secretary of State as well as the other defendants. The decree in that sense would in no way interfere with the exercise of the Secretary's discretion with respect to the issue of a passport but would simply preclude the denial of a passport on the sole ground that Miss Elg had lost her American citizenship.

The decree will be modified accordingly so as to strike out that portion which dismisses the bill of complaint as to the Secretary of State, and so as to include him in the declaratory provision of the decree, and as so modified the decree is affirmed.

*Modified and affirmed.*

MR. JUSTICE DOUGLAS took no part in the consideration and decision of this case.

