PERRI v. ACHESON, Secretary of State.

Civ. A. No. C–333–50.

United States District Court
D. New Jersey.

June 17, 1952.

Peter P. Artaserse, Jersey City, N. J., Samuel Paige, New York City, for plaintiff.

Grover C. Richman, Jr., Camden, N. J., Edward V. Ryan, Jersey City, N. J., for defendant.

HARTSHORNE, District Judge.

Plaintiff files his complaint under the provisions of Title 8, Section 903, of the United States Code Annotated, whereby he seeks judgment declaring him to be a citizen of the United States, his application for a United States passport having been denied him in September 1949 by the American Consulate General at Naples, Italy. The facts are substantially as follows:

▮ Plaintiff was born in Italy November 24, 1913 of parents originally Italian. Previously his father had come to this country and been naturalized here. Thus, under our law, plaintiff was by birth an American citizen.

But, after such naturalization here, plaintiff's father and mother returned to Italy before plaintiff's birth. The father under the terms of the Italian Nationality Law of June 13, 1912 reacquired Italian citizenship by residence in Italy.[1] Thereupon, under the terms of such law, plaintiff became an Italian citizen [2]—the typical situation of dual citizenship. While plaintiff's father thereafter returned to this country, plaintiff remained in Italy. His father returned to Italy in 1926, and died there in 1941.

Meanwhile plaintiff had served in the Italian Army for extended periods, both before and during World War II. He first entered the Italian Army in 1933, when 20. He admits that at this time he did not claim American citizenship to the Italian authorities. Though not called to active duty for some seven months, he took no steps during that time to relieve himself of this service because of American citizenship. In April 1934 he was called to duty. Thereafter his period of service in the Italian Army extended for more than nine years, subject to some terms of inactive service and leave, for marriage and other purposes. He claims that some time during this period of service he talked to his officers of his American citizenship, but was told he had to serve anyway. The credibility of this claim is in doubt in view of his relatively recent sworn statements before the United States Consul General in Italy taken at length, not in English, but in Italian.

But, in any event he never made formal claim of American citizenship during this entire period, despite the fact that, subject to certain leaves, he was engaged for practically five entire years in fighting against the United States and its allies in the North African campaigns. Indeed, his military services against this country, instead of being reluctant, as against the country to which he now claims he was always loyal, were apparently so effective that he was given a promotion.

Furthermore, during this period he was permitted to return home several times, once for three months to get married. Clearly his added responsibilities naturally would then have induced him to consider his future in all aspects. Clearly then he was not under actual duress. Despite that, instead of claiming American citizenship, he again returned to the front to engage in combat against the United States and its allies for another year or more. Thereafter he received another leave to return home for a substantial period. Even then, with United States troops in Italy, from whom he could have sought protection, had he been in actual duress, he took no steps whatever to claim United States citizenship, but instead, reported back again for duty to the Italian Army. That plaintiff's active combat service against this country in World War II was as a loyal subject of Italy, and not as a loyal subject of the United States, is self-evident.

1. Italian Nationality Law June 13, 1912, Article IX, Sec. (3). "Article IX. He who has lost citizenship * * * may reacquire it:
 "(3) After two years of residence in the kingdom * * *."

2. Italian Nationality Law June 13, 1912, Article XII. "Minor non-emancipated children of those who acquire or reacquire citizenship, become citizens * *."

After the war, when the Italian elections occurred, he cast his vote as an Italian citizen in both the municipal and national elections of 1946. He claims this voting was under duress. But he did not vote in the national elections of 1948, when exactly the same conditions of alleged duress existed. The reason why he did not vote in 1948, is simply because that was after he had made application to be recognized as a United States citizen. It is obvious that his fear of loss of a food card, which he claimed as the duress in question, did not suffice to deprive him of his free will in 1948.

■ As said by the United States Supreme Court in Perkins v. Elg, 1939, 307 U.S. 325, at page 329, 59 S.Ct. 884, 887, 83 L.Ed. 1320, "It has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties." The Court reiterated this principle on page 334 of 307 U.S., on page 889 of 59 S.Ct. And this principle would apply, a fortiori, to one who at birth was not solely American, but of dual citizenship as was Perri. Mandoli v. Acheson, D.C.Cir., 1952, 193 F.2d 920; Segreti v. Acheson, D.C. Cir., 1952, 195 F.2d 205. The latter case, in which plaintiff was held to have lost American citizenship, in its facts is essentially on all fours with the case at bar, save that Segreti, unlike Perri, had never fought against this country, of which she claimed citizenship. Thus, Perri, who admitted before the American Consul General, under oath, that he was known and considered in his community as an Italian, had become an expatriate of this country, even before the outbreak of World War II. This was because, after he became twenty-one in 1934, he remained in Italy for at least six years before the war, as an Italian, without taking any steps whatever to assert his American citizenship, and without any hindrance whatever from so doing, save during the few months he was on active army duty.

■ In addition, it is, of course, the law, that if plaintiff's service in the Italian Army, and also his voting in the above elections, were voluntary, they would result in his expatriation, even if his previous conduct had not expatriated him. On the other hand, if such military service and voting were under such duress, as to overcome his will to be an American citizen, they would not have that effect. Perkins v. Elg, supra; Doreau v. Marshall, 3 Cir. 1948, 170 F.2d 721, 724. In the Doreau case, the Court lays down the general rule as to such duress as follows: "If by reason of extraordinary circumstances amounting to true duress, an American national is forced into the formalities of citizenship of another country, the sine qua non of expatriation is lacking. There is not authentic abandonment of his own nationality. His act, if it can be called his act, is involuntary. He cannot be truly said to be manifesting an intention of renouncing his country. On the other hand it is just as certain that the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress."

We turn to his service in the army.

As seen above, his active combat service against this country and its allies during practically the entire course of the war, recognized by the Italian authorities by promotion, as being not reluctant, but effective, clearly shows he served as a loyal subject of Italy, not as a loyal subject of this country. This cannot be disputed.

Plaintiff's sole contention is that because, like practically all the rest of the Italian youth, he entered the army as a draftee, not as a volunteer, not only his entry, but his entire subsequent service during the course of some nine years, five of them in combat during World War II against the United States, was under duress. In support of this contention, plaintiff relies on Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 1947, 161 F.2d 860. This however, indicates a misapprehension of that decision, particularly as elucidated by the later decision of the same eminent court, in DiIorio v. Nicolls,

1 Cir., 1950, 182 F.2d 836. In the Dos Reis case, lengthy service in combat against the United States, indicated in DiIorio as the most conclusive evidence of disloyalty to the United States, was in nowise involved. What was involved was the conscription in the Portugese Army of one who outspokenly claimed American citizenship. Here the court dealt, not with one fighting against the United States, but with one in an army which was allied with that of this country. Here the court dealt with one who vehemently protested against his being drafted, not because he was opposed to serving Portugal, as all young Portugese were required to serve, but expressly because he claimed American citizenship. And, "As soon as he (Camara) could manage it he returned to this country, as a stowaway, which attests the intensity of his purpose to retain his American nationality." Dos Reis ex rel. Camara v. Nicolls, supra, 161 F.2d at page 862. To the contrary, Perri never protested his American citizenship on being drafted into the Italian Army.

Let us consider first Perri's entry into the Army, second, his service therein, each of which may constitute a cause of expatriation.[3] As to the entry into the Army in the Dos Reis case, Camara's drafting clearly overcame his will to retain American citizenship. Thus, such entry was under duress, and could not constitute a ground for expatriation. But when Perri was drafted, he made no such claim, formal or informal. His will to remain an American was not overborne. Insofar as his interest in American citizenship was concerned, there was no duress. The only compulsion that existed as to him was the Italian law, under which he, known as an Italian, with all other young Italians, were inducted into the Army. "But that does not amount to an involuntary or forced act in the sense that he was compelled to perform such acts in spite of an 'intensity of * * * purpose to retain his American

nationality.' Dos Reis ex rel. Camara v. Nicolls, supra. Any claimed reluctance in the performance of these acts was no more than may have conditioned the minds of many other Italians at the time." Cantoni v. Acheson, D.C.N.D.Cal.S.D.1950, 88 F.Supp. 576, 578.

 Indeed, in view of the practically world-wide policy of foreign states to conscript in the recruitment of their armies, a policy well known to the Congress of the United States before it enacted the expatriation provision in question, Congress could hardly have intended that conscription per se should render its Nationality Code inapplicable to the situation. For if such were the case, this provision of the Nationality Code would be almost a waste of words. Can Congress have intended to say "that the hundreds of thousands of United States servicemen who were conscripted and served during the last war were involuntarily forced into the service under duress? On the contrary, when they answered the call to arms without resistance their action was voluntary and this included those who did not view the prospect of army life with relish as well as those imbued with the zeal of patriotism." Hamamoto v. Acheson, D.C.S.D.Cal.1951, 98 F.Supp. 904, 905. Rather it would seem that Congress must have recognized army conscription to be the order of the day, and that accordingly conscription per se was covered by the Nationality Code.

 However, even if it be admitted, for the sake of argument, that the world-wide policy of conscription was not within the mind of Congress in enacting these provisions of the Nationality Code, Congress distinguished in such provisions between "entering" the armed forces of a foreign state and "serving" in such armed forces. We therefore turn to the consideration of Perri's service in the Italian forces for some nine years, during at least five of which he was in active combat against the United States and its allies,

---

3. Nationality Code, 8 U.S.C.A. § 801
 "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:
 * * * * * *

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state;".

his services against this country having been so efficient that he was promoted. Obviously, these services were as a loyal subject of Italy, not as a loyal subject of the United States. Obviously they, plus his lengthy return to Italy to marry, with United States troops in Italy for his protection from compulsion, had he desired it, all indicate that his service in the Italian Army, far from being under duress, was completely voluntary, as a loyal son of Italy. Perri's situation is thus essentially on all fours with that of the Italian held an expatriate in the above DiIorio case, and by the same court which decided the Dos Reis case. For DiIorio, while "inducted" into the Italian Army, thereafter "served voluntarily" therein, and was therefore held to have lost his American citizenship. Indeed, in the DiIorio case, the Court obviously considered such service in an army combatting the armed forces of this country, as being the most conclusive evidence of an intent not to be loyal to this country, if same were not, indeed, treason, for one still a citizen of this country. Thus, quite regardless of whether Perri's induction into the Italian Army expatriated him, his long-continued service in such army, in combat against this country, clearly did have that effect, under the very words of the statute.

But lest there be any question, as to Perri's acting during all this time as an Italian, rather than as an American, we turn to his "voting in a political election in a foreign state", itself a cause of expatriation under the code. [4] Perri claims that he voted because he feared the loss of his ration card—the stock answer. But it will be noted that he voted in both the municipal and national elections in 1946, and not in the national election of 1948. Such was the situation in Italy in both 1946 and 1948, that the Congress tendered a ready means to one who voted in the national elections of either 1946 and 1948, to overcome the effect of any expatriation resulting therefrom. 8 U.S.C.A. § 723 note, Pub.

Law 114, Chapter 321—82d Cong., 1st Sess. This of itself indicates there was similar pressure as to voting at both these national elections. But the real question is, whether this pressure sufficed to overcome the will of that individual to remain loyal to the United States, to the extent that such voting was under duress in that regard.

Here we have the same individual operating under the same duress at both times, yet feeling free at one of these times not to vote. Since the same pressure failed to make him vote in 1948, it cannot be said to have compelled him to vote in 1946. This is entirely without regard to the fact that he voted also in the 1946 municipal elections, at which time any existing pressure was doubtless less than at the national elections. In short, by his voting plaintiff also expatriated himself from the United States under the statute.

Since the findings of fact and conclusions of law of the court appear in the above opinion, they will not be duplicated.

An order for judgment for defendant may be entered accordingly.

---

4. Nationality Code, 8 U.S.C.A. § 801.
 "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:
 * * * * * *

"(e) Voting in a political election in a foreign state or participating in an election or plebescite to determine the sovereignty over foreign territory."