KENJI KAMADA
v.
DULLES.

TSUME SAKAMOTO
v.
DULLES.

TERUO OSHITA
v.
DULLES.

YOSHIHARU YOKOMIZO
v.
DULLES.
Civ. Nos. 32175, 32176, 32274, 32275.

United States District Court
N. D. California.
Aug. 10, 1956.

Mas Yonemura, Oakland, Cal., for plaintiffs.

Charles Elmer Collett, San Francisco, Cal., for defendant.

WEINFELD, District Judge.

These are a series of cases brought respectively by four plaintiffs pursuant to Section 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903,* for a judgment declaring each plaintiff to be a national of the United States.

All the plaintiffs were born in the United States of Japanese parents who were citizens of Japan. Thus they were American citizens by birth, Constitution, Amendment XIV, and under Japanese law citizens of Japan, or in other words they had dual nationality.[1]

In three of the actions wherein Kenji Kamada, Teruo Oshita and Yoshiharu Yokomizo are plaintiffs, each admittedly was conscripted into and served in the Japanese army at various periods during World War II and each voted in the Japanese national elections conducted under the auspices of the American occupation forces following the termination of hostilities. In the fourth action wherein Tsume Sakamoto is plaintiff, she too voted in the Japanese elections and in addition was employed as a teacher from 1941 through 1949 in primary schools operated by a Japanese prefecture or municipality.

Under one or more subdivisions of Section 401 of the Nationality Act of 1940,** service in a foreign army or voting in a political election of a foreign country, or service in any employment of a foreign state, if one has the nationality of such state, effects loss of citizenship or expatriation.

The basic question to be decided in each case is whether the proscribed action was voluntary.[2] Here the acts relied upon by the government to establish expatriation are not in dispute. On the contrary, the allegations of the respective complaints set them forth, but then affirmatively plead that they were not the voluntary and free acts of the plaintiffs but were the result of duress and coercion. Since the government has made out a prima facie case by the acknowledgment of the respective plaintiffs of the commission of one or more acts condemned by sec. 401, the burden of going forward to establish their involuntary nature is upon the plaintiffs.[3]

To meet this burden each plaintiff has testified in effect that the voting in the national elections and army service in the instance of the three male plaintiffs, and employment as a school teacher, of the plaintiff Sakamoto, were the result of coercion and duress, and this testimony, if believed or accepted by the trier of the facts,[4] would require the Government to establish the contrary to overcome this evidence. Upon the whole case, to effect expatriation, the evidence must be clear, unequivocal and convincing.[5]

The rule as to the burden of proof in expatriation cases has recently been stated in Stipa v. Dulles, 3 Cir., 233 F.2d 551 as follows:[6]

"The burden of proving expatriation generally is upon the defendant who affirmatively alleges it and the burden is a 'heavy' one. Factual

---

\* Now 8 U.S.C.A. § 1503.

1. See Kawakita v. United States, 343 U.S. 717, 720, 723, 72 S.Ct. 950, 96 L.Ed. 1249; Perkins v. Elg, 307 U.S. 325, 339, 59 S.Ct. 884, 83 L.Ed. 1320.

\*\* Now 8 U.S.C.A. § 1481(a).

2. Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320.

3. Pandolfo v. Acheson, 2 Cir., 202 F.2d 38.

4. There is no requirement that the testimony of the plaintiff in an expatriation case be corroborated. Pandolfo v. Acheson, 2 Cir., 202 F.2d 38; Insogna v. Dulles, D.C.D.C., 116 F.Supp. 473.

5. Gonzales v. Landon, 350 U.S. 920, 76 S.Ct. 210.

6. See also, Alata v. Dulles, 95 U.S.App. D.C. 182, 221 F.2d 52; Monaco v. Dulles, 2 Cir., 210 F.2d 760; Soccodato v. Dulles, 96 U.S.App.D.C. 337, 226 F.2d 243.

doubts are to be resolved in favor of citizenship. The burden of proof on the government in an expatriation case is like that in denaturalization; the evidence must be clear, unequivocal and convincing. The rule prevailing in denaturalization cases, that 'the facts and the law should be construed as far as is reasonably possible in favor of the citizen' equally applies to expatriation cases. American citizenship is not to 'be lightly taken away.' "

Essentially I am called upon to determine a fact question—whether each plaintiff has carried his burden of showing that the conduct which effects forfeiture of citizenship and is admitted, was involuntary and committed under duress or coercion, including economic coercion.

██ On this issue, that is, what proof will satisfy plaintiffs' burden of going forward, the Court of Appeals for this Circuit in Mitsugi Nishihawa v. Dulles, 235 F.2d 135, seems to have taken a contrary view to that of the Third Circuit Court of Appeals in Lehmann v. Acheson, 206 F.2d 592, which held that conscription into the army of a foreign government of one holding dual citizenship is sufficient to establish prima facie that his entry and service were involuntary. Accordingly, in my fact determination I am guided by and follow the rule of this Circuit as enunciated in the Nishihawa case to the effect that there is no presumption that one who is conscripted into the armed forces enters involuntarily and that all circumstances must be looked to to resolve the issue of voluntariness, and further the burden is cast upon the plaintiff of going forward to show that his service was involuntary.[7] Of course the same burden is with each plaintiff on the matter of voting and in the instance of the plaintiff Sakamoto, on the subject of her employment as a school teacher.

██ I first dispose of the teacher employment issue. I am of the view that teaching in a public school system operated by a foreign government or a political subdivision thereof is not the type of employment by a foreign government which is condemned by sec. 401(d). I am of the opinion that it intended to encompass service in or on behalf of a foreign government, the performance of which required absolute allegiance to the employing government and necessarily excluded allegiance to our government. Teaching as such does not come within this category. It is difficult to understand why if plaintiff had been employed by a privately operated school she would not forfeit her American citizenship whereas performance of the same service in a school operated by a foreign government would effect that result. I do not believe that subdivision (d) of sec. 401 intended such a consequence in the instance of such employment.[8]

██ In any event, I am satisfied, and upon the facts find that plaintiff's service as a school teacher was a matter of economic compulsion and hence was not her free and voluntary act.[9]

I pass to a consideration in broad outline of the evidence offered by each plaintiff to show that the specific acts which come within the prohibition of the expatriation statute were not voluntary.

Kenji Kamada was born at Bellevue, Washington in 1916. He was taken to Japan by his parents when he was one year old. He was graduated from a Japanese middle school, which is the equivalent of our high school. He returned to the United States in 1935 and remained here until 1941 when he went back to Japan. The occasion was to take his father's remains there for funeral

---

7. Cf. Chin Chuck Ming v. Dulles, 9 Cir., 225 F.2d 849; Namba v. Dulles, D.C.N.D. Cal., 134 F.Supp. 633; Hiroshi Okada v. Dulles, D.C.N.D.Cal., 134 F.Supp. 183. See also, Mandoli v. Acheson, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146.

8. Cf. Akiyo Oye v. Acheson, D.C.N.D.Cal., 110 F.Supp. 635.

9. See, Stipa v. Dulles, 3 Cir., 233 F.2d 551; Insogna v. Dulles, D.C.D.C., 116 F.Supp. 473.

services, and he was accompanied by his mother and sister.

He was inducted into the Japanese Army in April, 1943 and served until June, 1946. Upon receipt of the notice to appear for physical examination prior to his induction, he sent a letter to the Village Master advising that prior to returning to Japan he had registered in the United States under the Selective Service Act,† that he intended to go into the United States army and did not want to serve in the Japanese army. The Village Master answered advising that if he refused to be conscripted the Kempei Tai (the military police) would jail him. He believed this was true and feared he would be beaten and his mother and sister would be persecuted if he did not appear and serve.

The next case is that of Teruo Oshita. He was born in 1920 at Cherokee, Wyoming. When seven years of age he was taken to Japan by his parents, as were his younger brother and sister. The parents returned to the United States in 1928 but he remained there with his brother and sister. They were taken care of by their grandmother.

Oshita attended primary school, middle school and high commercial school. He returned to the United States in July, 1939 to visit his parents and thereafter went back to Japan in January, 1940 to complete his education at the high commercial school. He testified he always intended to return to the United States and in 1937 went to the American Consulate and registered as an American citizen.

He was conscripted into the Japanese army in January, 1942 and served from February, 1942 to December, 1945. He did not refuse to serve in the armed forces once conscripted because he had heard that anyone who failed to obey the conscription order would be punished; and it was because of this fear he states that he did not refuse to serve when called. In this connection it is noted that in all instances involving conscription and service in the Japanese army that the military law of Japan provides as follows:

"Article 74:

"Any person who evades military service by deserting or hiding, injuring wilfully one's body, or acquiring disease and by other acts of fraud, will be punished to penal servitude of 3 years or less.

"Article 75:

"Persons called for military service who delay entering the barracks for more than 10 days, without any legitimate reasons, shall be punished by imprisonment of 6 months or less; during wartime, when 5 days have elapsed, shall be punished by imprisonment of 1 year or less."

The third case is that of Yoshiharu Yokomizo who was born in 1923 at Oakland, California. When he was three years of age he was taken to Japan by his grandmother. He was educated at Japanese schools and also attended Hosei University in Tokyo. He planned to return to the United States upon graduation from the University which he entered in 1940. In 1941 he went to the American Consulate at Akasaka, Tokyo, to register as an American citizen.

He was conscripted into and served in the Japanese army from December, 1943 to September, 1945. Upon receipt of a notice to take the physical examination he protested to the Village Master and to the officer in charge of conscription. He advised them that he was an American citizen and requested that conscription be deferred, but was informed that under existing national circumstances his request could not be granted. At that time he had heard stories to the effect that if one refused to submit to physical examination he would be arrested and jailed by the military authorities; that his family would be subjected to mistreatment, and in consequence he was afraid and accordingly submitted to physical examination.

† Now 50 U.S.C.A.Appendix, § 451 et seq.

When he received orders to report for induction he complied for the same reasons that he felt he had to take the physical examination—that is, he believed he had to obey and if he did not he and his family, which at that time included his grandmother, mother, brother and sister, would all be punished.

As to voting in the national elections, all plaintiffs in various degrees testified in substance that General MacArthur's headquarters, through press, radio and other media of communication, had constantly urged qualified persons to vote in order to promote democracy, and in turn local leaders impressed upon everyone the need to participate in the elections; that refusal to vote would result in reduction of rations and ostracism and that persecution would also be visited upon non-voters and members of their family. That the substance of their versions is in accord need occasion neither suspicion nor surprise, especially when considered in the light of what one witness termed the prevailing "climate" in Japan, and which is forcefully described in Akio Kuwahara v. Acheson, D.S.S.D. Cal., 96 F.Supp. 38, 43, and Hichino Uyeno v. Acheson, D.C.W.D.Wash., 96 F.Supp. 510, 517, 519. Indeed it hardly appears to be questioned that the campaign stressing the function of voting was so powerful that many deemed it mandatory to vote, and it has been suggested that the Watkins Act, Act July 20, 1954, 8 U.S.C.A. § 1438 note, passed by Congress for the restoration of citizenship to American born Nisei who voted in Japan recognized the involuntary nature of the Japanese elections following the war.[10]

Upon a review of the entire evidence given in each case, an appraisal of the witnesses and their demeanor upon the stand, I am persuaded that the various versions given by them are trustworthy and accord with the facts and that the plaintiffs have sustained their respective burdens. Since the Government has offered no countervailing evidence, it would appear upon the entire case that there is an absence of that clear and convincing evidence which is required before expatriation can be effected. I find that the various acts of the individual plaintiffs were not voluntary. Cf. Hiroshi Okada v. Dulles, D.C. N.D.Cal., 134 F.Supp. 183; Serizawa v. Dulles, D.C.N.D.Cal., 134 F.Supp. 713; Namba v. Dulles, D.C.N.D.Cal., 134 F. Supp. 633.

Counsel will submit proposed detailed further findings of fact and conclusions of law in accordance with the Rules.

---

10. Serizawa v. Dulles, D.C.N.D.Cal., 134 F.Supp. 713, 714.