## MATTER OF ACOSTA

### In EXCLUSION Proceedings

### A-13312393

*Decided by Board August 12, 1964*

Expatriation under section 349(a)(4)(B), Immigration and Nationality Act, is established when it is demonstrated that an oath of allegiance is required for the specified employment (Cuban National Police) and the individual concerned held such employment.

EXCLUDABLE: Act of 1952—Section 212(a)(20) [8 U.S.C. 1182]—Immigrant, no visa.

The special inquiry officer, in an order dated April 3, 1964, directed that the applicant be admitted to the United States as a citizen hereof. The Service appeal from that decision, which brings the case before this Board for consideration, will be sustained. The applicant's exclusion from the United States on the above-stated ground will be ordered.

The record relates to a 42-year-old married male, a native of Cuba, who acquired United States citizenship by virtue of naturalization on September 2, 1955. On July 1, 1957, he proceeded to Cuba and within a brief period of time after arrival there, through the efforts of his brother who was a captain of the Cuban National Police, was appointed to that organization.[1] He retained his position therein from July of 1957 until January 13, 1959. On the latter date, he was arrested by officials of the Castro Government and imprisoned until January 19, 1962. He arrived in the United States on December 27, 1962, in the status of a Cuban refugee and was paroled into this country as such. When he eventually thereafter decided to advance his claim to United States citizenship, this exclusion proceeding resulted.

The crux of this case is whether the applicant lost his United States citizenship, by virtue of his employment in the Cuban National Po-

---

[1] He had been a member thereof for a period of about 15 days in 1952.

lice, under the provisions of section 349(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1481), which reads as follows:

From and after the effective date of this Act[2] a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, for which office, post, or employment an oath, affirmation, or declaration of allegiance is *required;* (Emphasis supplied.)

The special inquiry officer has answered this question in the negative, on the basis of a conclusion that an actual taking of an oath of allegiance had to be established, and a finding that the Government had not met its burden of proof in establishing this fact. We, however, disagree with the special inquiry officer, holding that the use of the word "required" in the statute does not have the significance attached to it by the special inquiry officer. Accordingly, and for the reasons hereinafter set forth, his decision will be reversed.

In enacting subsection (2) of the statute here under consideration, the Congress of the United States specifically provided that loss of nationality would result from the "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof." In view of this prior provision within the statute, the special inquiry officer's interpretation renders subsection (4)(B) thereof completely unnecessary. In other words, if the fact of taking the oath was essential, the Congress would have stopped with the enactment of subsection (2) and subsection (4)(B) would be meaningless. We cannot and will not attribute such a useless gesture to the Congress of the United States. It is, therefore, our conclusion that expatriation is established under the statutory provision here under consideration when it is demonstrated that an oath of allegiance is "required" for a certain position and that the party concerned held such a position. In reaching this result, we have applied the fundamental rule of statutory construction that ordinary words must be given their ordinary meaning.

Thus, we take cognizance of the fact that lexicographers unanimously accord to the word "required" the essential element of compulsion. Also, Law Decree 1958 of January 25, 1955, the organic law of the Cuban National Police, set forth in a letter from the law library of the Library of Congress, dated July 30, 1963 (Ex. No. 6), Article 197, sets forth that an oath of allegiance was a "must" for any person entering the service of the National Police. In addition, the Government produced as a witness one Colonel Esteban Ventura Novo who from 1956 to 1957 was in charge of the training, education

---

[2] December 24, 1952.

and recruiting policemen in Cuba and who testified (Ex. 7) that he knew from his own knowledge that all members of the Cuban National Police were required to subscribe to the oath of allegiance since he was the person who had to administer the oath; and that the oath was taken before the Cuban flag. He further testified that it was not possible for any person, through the exercise of any political influence whatsoever, to be appointed to the Cuban National Police and not be required to take the oath because he would never have permitted it. The Government also produced an affidavit signed by a Colonel Marino Paget, a Lieutenant Colonel with the Cuban National Police who retired after 27 years of service in that organization, wherein the affiant set forth that he had personal knowledge that any person entering on duty with the Cuban National Police was required to take an oath of allegiance to the Republic of Cuba. Finally, on this point, the applicant did not deny this evidence, but merely claimed that he did not remember whether he took the oath. Under these circumstances, we find that it is established, not only by a preponderance of the evidence but also clearly and convincingly, that an oath of allegiance to the Cuban Government was "required" of the position occupied in Cuba by this applicant.

There is no question in our mind but that the duties performed by the applicant in connection with his position in the Cuban National Police constituted serving in the employment of a foreign state within the contemplation of this statute. As will be made clear by a discussion of the oath which is a necessary concomitant of that employment, *infra*, it is clear that the position encompassed service in or in behalf of a foreign government, the performance of which required absolute allegiance to the employing government and necessarily excluded allegiance to the Government of the United States. That is the test to be applied under this section of the law (*Kamada* v. *Dulles*, 145 F. Supp. 457).

The letter from the Library of Congress previously referred to (Ex. 6) sets forth that the oath of office which must be taken by any person entering the service of the Cuban National Police, whether as officer, cadet, or member of the corps, is as follows:

I . . ., in the service of the Republic of Cuba, solemnly swear (or promise) that I will support and defend the precepts of the Constitution, Laws and Government of the Republic, against all national or foreign enemies; that I accept this duty freely, without mental reservation or intention to avoid its performance, and that I shall discharge well and faithfully the duties of my office.

Certainly, there can be no doubt that the foregoing constitutes an oath within the meaning of this section of the law. As we read it, that oath places the person taking it in complete subjection to the state to which it is taken, at least for the period of contract, so that it is impossible

for him to perform the obligations of citizenship of this country. This is the proper test to be applied in such a case (*Fletes-Mora* v. *Rogers*, 160 F. Supp. 215 at 218).

Finally, on this point, no issue of duress in connection with the employment has been raised by the applicant. Also, careful analysis of the record reveals that no such a claim could be substantiated. The applicant, a citizen of the United States, left this country of his own volition and proceeded to Cuba where he obtained the position in question with the influence of his brother.

Accordingly, and since the applicant lacked documents valid for admission into the United States as an alien at the time of his above-described last arrival, his excludability on the above-stated ground is established.

ORDER: It is ordered that the Service appeal be sustained; that the special inquiry officer's order of April 3, 1964, be withdrawn; and that the applicant be excluded and deported from the United States on the above-stated ground.