**KIYOKURO OKIMURA v. ACHESON,**
**Secretary of State.**
**Civ. No. 1027.**

United States District Court, Hawaii.
Sept. 12, 1951.

Katsuro Miho and Fong, Miho & Choy, Honolulu, T. H., A. L. Wirin, Los Angeles, Cal., for plaintiff.

Howard K. Hoddick, Acting U. S. Atty. Dist. of Hawaii, Honolulu, T. H., for defendant.

McLAUGHLIN, District Judge.

This is a Section 903, Title 8, United States Code Annotated suit seeking a declaration of United States citizenship.

### Findings of Fact.

I find the following as fact:

1. The plaintiff was born at Kauai, Hawaii, United States of America, in 1921.

2. At birth he became a United States citizen, and also a subject of Japan.

3. At age 4, plaintiff was taken to Japan for educational purposes, remaining there until 1932.

4. In 1934, plaintiff returned to Japan to further this Japanese education so that he might return to Hawaii and teach in a Japanese language school.

5. In 1934, plaintiff went to Japan, not upon a United States passport, but possessed only of a certificate of citizenship, Hawaiian Islands, issued by the United States Immigration Service pursuant to regulations.

6. At no time did plaintiff register in Japan as an American citizen with any United States consul.

7. In 1939, as some of his Middle School classmates who were United States citizens decided to return to the United States to avoid the Japanese Military Conscription law, plaintiff joined them, but had proceeded only as far as Kobe, Japan, when his mother overtook him and compelled his return to school. In fulfillment of his parents' desires, plaintiff was graduated from Middle School, and thereafter attended, until mid 1942, Normal School.

8. At Middle School plaintiff was required to take an officer candidates' examination, and as he rated but a "B", due to his intentionally poor showing, he successfully avoided being rated as an officer candidate for the Japanese Army.

9. Up to 1942, the Japanese government paid one half of a student's tuition at Normal School; thereafter the government paid it in full.

10. Up to 1942, unless repaid, the government could compel a graduate to accept a teaching assignment; thereafter no such option existed, and plaintiff was ordered to and did teach at Miwa.

11. In mid-June 1942, plaintiff received his notice to report for a Japanese Army physical examination.

12. Fearing the military police and that he would be shot or imprisoned, plaintiff reported for his physical. He, however, approached the colonel in command and asked to be excused as a United States citizen. This request infuriated the officer who slapped the plaintiff and called him an "ideological criminal."

13. Plaintiff passed his physical, and was classified 1–B.

14. Plaintiff was inducted into the Japanese Army in February 1943, seeing active service in China until captured in August 1945. He was returned to Japan in 1946. Prior to being separated from the Japanese Army, plaintiff had been promoted to the rank of sergeant.

15. When released, plaintiff returned to the parental residence in Japan, and thereafter resumed teaching school while awaiting further instructions when possible from his father who was, and had been during the war, in Hawaii.

16. In order to teach in postwar Japan, plaintiff had to be and was "cleared" by SCAP.

17. The war having blighted plaintiff's prospect of ever teaching in a Japanese language school in Hawaii, plaintiff took his father's advice and trained for a year to become a Buddhist priest.

18. In 1947, in Japan, plaintiff voted because General MacArthur had urged all to vote, and because he had heard that non-voters would lose their rice rations.

19. In 1949, being ready to return to Hawaii as a Buddhist priest, plaintiff applied for a United States passport. His application was denied on the ground that he lost his United States citizenship by serving in the Japanese Army.

### Conclusion of Law.

■ The plaintiff is entitled to the declaration of United States citizenship prayed for because Section 801(c) and (e)

of Title 8, United States Code Annotated, is unconstitutional.

## Opinion.

### 1. Introduction

May Congress divest a native born citizen of his birthright?

This inquiry raises the question of the long assumed constitutionality of 8 U.S.C.A. § 801(c) and (e), which reads as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\* \* \* \* \* \*

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; or

\* \* \* \* \* \*

"(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory \* \* \*."

The point under discussion does not involve the unquestioned power of Congress to enact naturalization laws and to condition the retention of the status of citizenship so acquired. Over such matters Congress has plenary power under art. 1, Section 8, Clause 4 of the Constitution:

"The Congress shall have Power \* \*.

"To establish an uniform Rule of Naturalization \* \* \*."

■ Too, it may be granted that a native citizen may lose that status by naturalization in a foreign country if the American national complies with the formalities with a specific, as distinguished from constructive, intention to cast off his United States citizenship.

Our concern is, rather, where in the Constitution is to be found any grant of power—specific or reasonably implied—by which Congress is authorized to divest an American born citizen of his nationality because, having also Japanese nationality, he served in the Japanese Army or voted in an election in Japan?

### 2. Birth: The Primary Legal Test of American Citizenship

■ The primary legal test by which United States citizenship is determined is place of birth. The test is a Constitutional one: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."—Amendment XIV, Section 1

■ It is the view of this Court that while the Constitution gives the Congress plenary power over citizenship by *naturalization*, it leaves the Congress no power whatsoever to interfere with American citizenship by *birth*.

The leading case on this subject is United States v. Wong Kim Ark, 1898, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890. While some of its teachings seem to have been occasionally forgotten or whittled down in recent years, it has never been overruled.

The question there presented by the record was whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, were subjects of the Emperor of China, but had a permanent domicile and residence in the United States and were there carrying on business, and were not employed in any diplomatic or other official capacity under the Emperor, became at the time of his birth a citizen of the United States.

After an exhaustive review of the authorities, in the United States and abroad, the Supreme Court said: "There is, therefore, little ground for the theory that at the time of the adoption of the fourteenth amendment of the constitution of the United States there was any settled and definite rule of international law generally recognized by civilized nations, inconsistent with the ancient rule of citizenship by birth within the dominion." 169 U.S. at page 667, 18 S.Ct. at page 464, 42 L.Ed. 890.

To put beyond further argument the lack of Congressional power to take away

American citizenship acquired by birth, the Court continued: "The fourteenth amendment, while it leaves the power, where it was before, in congress, to regulate *naturalization,* has conferred no authority upon congress to restrict the effect of *birth,* declared by the constitution *to constitute a sufficient and complete right to citizenship."* (Emphasis supplied.) 169 U.S. at page 703, 18 S.Ct. at page 478, 42 L.Ed. 890.

That principle has been followed to the present day. In Morrison v. People of State of California, 1934, 291 U.S. 82, 85, 54 S.Ct. 281, 283, 78 L.Ed. 664, Mr. Justice Cardozo said, citing the Wong Kim Ark decision, supra: "A person of the Japanese race is a citizen of the United States if he was born within the United States."

And in Dos Reis v. Nicolls, 1 Cir., 1947, 161 F.2d 860, 862, the Court said: "When Camara was born in Massachusetts in 1921, he then became an American citizen, not by gift of Congress, but by force of the Constitution of the United States (Fourteenth Amendment)", citing the Wong Kim Ark case, supra.[1]

3. *The "Right" of Expatriation is not to be Converted into a Liability by Congressional Fiat.*

Section 800 of Title 8, United States Code Annotated, deals eloquently with the "right" of expatriation, yet Section 801, applicable alike to native and naturalized citizens, attempts to spell out some ways in which that "right" may become a liability.

It is the holding of this Court that the only means of divesting one's self of United States citizenship is by voluntarily undergoing in a foreign state a process comparable to our own naturalization procedure.

Congress may not thus declare that by performing such and such an act, in or out of the United States, a citizen will become expatriated. Congress has been given control over only one means of *creating* United States citizenship, namely by naturalization. It has the power to create and to condition that grant of citizenship; but it is wholly devoid of any power to destroy citizenship by *birth.*

The contention that Congress may wipe out one's status as a United States citizen by declaring that the performance of such and such an act will result in expatriation can be reduced to an absurdity. Suppose, for example, that Congress instead of legislating as it has in Section 801(c) and (e), had simply declared that owning a gun, or voting in a school or a bond election in a foreign state was sufficient to effect a forfeiture of United States citizenship. Or, going a step further, suppose Congress were to say that attending a military parade, or a political rally in a foreign country would do the trick. Can United States citizenship be frittered away so easily?

And there is also another side to be considered. May the duties and responsibilities of United States citizenship be avoided by convenient expatriation under Section 801? See Kawakita v. United States, supra, and other recent treason cases where loss of citizenship was asserted as a defense.

United States citizenship may more easily be acquired than lost.

Stricter enforcement of the law of treason may well be the solution to the problem of dual citizens such as this, who selfishily play one country against the other.

4. Conclusion.

■ It is the opinion of this Court that a native American citizen can be deprived of his birthright only if he undergoes some foreign procedure comparable to our system of naturalization.

The Constitution of the United States prescribes only two methods by which American citizenship can be acquired: by

[1] This Court is aware that there have been authoritative intimations to the contrary. See Mackenzie v. Hare, 239 U.S. 299, 311–312, 36 S.Ct. 106, 60 L.Ed. 297; Perkins v. Elg, 307 U.S. 325, 329, 59 S.Ct. 884, 83 L.Ed. 1320; and Kawakita v. United States, 9 Cir., 1951, 190 F.2d 506. But only in the Mackenzie case was the precise Constitutional question here involved squarely presented, and there under vastly different facts.

birth and by naturalization. I do not believe that Congress can specify means of losing that citizenship that are in no way related to the means of acquiring it.

Petition granted.