**ACHESON, Secretary of State v. WOHLMUTH.**

No. 10917.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 19, 1951.

Decided April 24, 1952.

Joseph A. Sommer, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty., at the time the brief was filed, Ross O'Donoghue, Joseph M. Howard, and L. Clark Ewing, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellant.

Charles M. Irelan, U. S. Atty., at the time of argument, Washington, D. C., also entered an appearance on behalf of appellant.

Henry F. Butler and Robert J. Stevenson, Washington, D. C., for appellee.

Before CLARK, PRETTYMAN and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a citizenship case. Plaintiff-appellee, a New Yorker by birth, married a German national in 1926. Thereafter she went to live in Germany with her husband, remaining there during and after World War II. On June 30, 1946, plaintiff-appellee voted in an election held in the American Occupied Zone of Germany. In the following year her application for an American passport was denied on the ground that by casting her ballot she had expatriated herself under Section 401(e) of the Nationality Act of 1940, 8 U.S.C.A. § 801(e). Pursuant to 8 U.S.C.A. § 903, she brought suit against the Secretary of State in the United States District Court for the District of Columbia, seeking a judgment declaring her to be an American citizen. From summary judgment rendered in her favor by the District Court, the Secretary of State has brought this appeal.

The main question for our decision is whether the election in which plaintiff-appellee voted was a "political election in a foreign state" as that phrase is used in the

Nationality Act of 1940, Section 401(e).[1] Appellee argues that here there was no "election"; that in any event it was not "political"; that Germany in 1946 was not a "state"; and that in any event it was not "foreign." We will consider these points, but it should be remembered that while analysis of each word in the expression may be of value, ultimately it is the meaning of the whole which we seek. It is the entire set of circumstances which must be examined, and it is the meaning of the whole expression in light of the statute's objectives which is determinative.

The first matter to be considered is whether Germany, or more especially its American Occupied Zone, is to be regarded as a "foreign state" within the meaning of the Nationality Act. We are satisfied that it is. When the Nationality Act was passed in 1940, Germany was very clearly as much a foreign state as any other European sovereignty. Later events have not altered that fact. The state of war, followed by the victory of the Allies, the destruction of the Nazi regime, and the occupation by the United States of a portion of Germany— none of these had the effect of rendering Germany or any of its parts less "foreign" than previously. Occupation by our troops does not make conquered territory a part of the United States or mean that such territory "ceased to be a foreign country, in the sense in which these words are used in the acts of Congress." Fleming v. Page, 9 How. 603, 50 U.S. 603, 13 L.Ed. 276. Such a view accords with the attitude to which this country adheres, that war should not be conducted for purposes of conquest. It also comports with the accepted rule of the law of nations that occupied territory is to be administered for the protection of the inhabitants and the occupying force; occupation should not be used as a device for transferring sovereignty. Oppenheim, International Law § 166 (6th Ed. 1944); IV Hackworth, Digest of International Law § 587 (1943).

Whether Germany in 1946 was a "state" in the fullest sense of that word, or in the sense in which the term is used in international law generally, is an inquiry we need not here pursue.[2] The determinative question is whether it remained a state within the meaning of the Nationality Act of 1940. Thus we inquire, not whether Germany was *sui juris* among the nations of the world, but whether it was a polity capable of commanding an allegiance inconsistent with allegiance to the United States. Impairment of Germany's status in the international community, uncertainty as to its boundaries, and legal and practical restrictions on its power to govern itself could not be controlling on that question.

Germany at all times remained a political entity—an entity to which men and women could give formal allegiance and in which they could hold citizenship.[3] This situation was quite consonant with Allied policy.

1. Section 401(e) of the Nationality Act of 1940, 54 Stat. 1168–69, 8 U.S.C.A. § 801 (e), provides:

    "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

    \* \* \* \* \* \*

    "(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory \* \* \*."

2. We are not persuaded by plaintiff-appellee's recital of the legislative history that Congress intended that the technical definition of a "state" commonly used in international law should circumscribe the meaning to be given that word in Section 401 of the Nationality Act. The Act deals with a particular class of problems removed from the usual international law context.

3. To paraphrase an opinion dealing with voting in Japanese elections:

    "To hold that [Germany] is not a foreign state is to say that a citizen of the United States may not only vote with impunity in [German] elections, but also without loss of citizenship apply for and obtain naturalization in [Germany], see Sec. 801(a) [of the Nationality Act of 1940]; take an oath of allegiance to [Germany], see Sec. 801(b); accept an office in the government of [Germany], see Sec. 801(d); make a formal renunciation of his United States citizenship in [Germany], see Sec. 801(f). Surely Congress could not have intended that such actions, if voluntarily done, would leave United States citizenship unaffected." Kuwahara v. Acheson, D.C.S.D.Cal., 96 F.Supp. 38, 40–41.

Although the destruction of the "Nazi State" was one of our war aims, and the attempted eradication of Nazi influences was one of the first measures to be taken by our occupying forces, governmental units staffed by Germans and responsible for many aspects of domestic government remained in existence, or were revived, with the consent and support of the American Military Government. From the start of the occupation, it was the policy of our Government to reconstitute German administrative machinery and to initiate German self-government, all looking toward the emergence of a new Germany.[4]

■ It becomes clearer that Germany was, for our purposes, a "state" when we consider the nature of the election of June 30, 1946, in which plaintiff-appellee participated. The general background of this and other elections held in the American Zone of Germany in the early period of the occupation is described as follows in Occupation of Germany, Policy and Progress, 1945–46, issued by the Department of State in 1947:[5]

"(b) *Elections.* It has been United States policy to foster democratic development by holding free elections. In this respect this Government has been in advance of the other powers. The first postwar elections in Germany, January 20 and 27, 1946, were for local councils in communities of less than 20,000 in the U. S. zone. Later elections have occurred as follows: for larger towns and rural counties, April 28; for cities, May 26; for *Land* constitutional assemblies, June 30; on *Länder* constitutions and for *Länder diets,* November 24 and December 1. Participation of qualified voters has been large, ranging from 60 to 89 percent. As a consequence of this series of elections two dominating parties have emerged, the CDU (CSU in Bavaria) and the SPD. * * *

"(c) *Constitutions.* The United States has also taken the initiative in seeking to restore a constitutional basis for the political life of Germany. In each *Land* of the U. S. zone constitutional assemblies, chosen by popular election on June 30, 1946, convened during the summer and drew up state constitutions on the basis of initial drafts prepared by special committees appointed by the three ministers-president. Vigorous controversy centered around such issues as the nature and powers of the executive, the existence and composition of a second chamber, religious influence in the schools, and the socialization of key industries. Military government gave a free hand to the assemblies except to prescribe that the

4. The Department of State described that policy thus in 1947:
   "The United States has consistently stressed the principle that administrative functions should be delegated as rapidly as feasible to Germans of approved character and political reliability. This was done early in the occupation for local governmental units (Gemeinde, Kreis). By October 1945, three state administrations had been set up in the zone —Bavaria, North Württemberg-Baden, and Greater Hesse—in addition to the separate administration for the Bremen enclave. In each *Land,* or state, appointed officials headed by a Minister-President were assigned full responsibility for internal affairs not involving security considerations. All aspects of German administration were carefully scrutinized and supervised by military government, which, by January 1946, was separately constituted as the Office of Military Government (OMGUS). During 1946 additional administrative functions were progressively transferred fom military government to German officials and agencies at all administrative levels. As noted earlier even such vital tasks as denazification are now undertaken by Germans. Appointive provisional parliaments, advisory in character, were set up in each *Land.* American policy is insistent that democratization can be achieved only through practical experience and the assumption by the Germans of direct responsibility for governmental actions." Occupation of Germany, Policy and Progress, 1945–46, Department of State Publication 2783, European Series 23, at p. 45 (U. S. Government Printing Office, 1947).
   This document was considered by the District Court and is part of the record here.

5. At pp. 55, 57. See note 4, supra.

documents insure democratic processes, the safeguarding of civil rights, and the supremacy of law. * * *"

The election of June 30, 1946, was thus held to choose a constitutional assembly for each *Land* or state. It was "fought on German political lines with lists of candidates put up by the political parties then licensed by American Military Government." [6]

Plaintiff-appellee does not challenge this factual description of the election. She argues, however, that it was not a "political election"—that it was more in the nature of "a straw vote or opinion poll, since it was merely advisory as far as the Office of Military Government of the United States was concerned." Nor does the Government dispute her statement that "Pursuant to its supreme authority the United States at all times had the power to alter the date of the election, to call off the election or to declare the results of the election null and void, and ultimately to approve, modify or disapprove any provincial constitution which the delegates might agree upon." (Br. p. 18) It is plaintiff-appellee's contention that the 1946 balloting was not a "political election" because it was not "a decisive election of persons to fill offices in, or to determine issues relating to an organized government or body politic. * * *" (Br. p. 16)

This argument has force. But we think the intent of Congress in the Nationality Act was to attach the consequence of loss of citizenship to conduct which substantially evidences allegiance to a government existing in a territory other than our own. It cannot be determinative that the foreign territory may not have democratic institu-

tions independent of external control. No narrow or technical meaning can be ascribed to the phrase "political election" as Congress used it in the Nationality Act. We think that formal balloting to choose representatives or delegates is an "election," and we think it is "political" if it "pertain[s] to the exercise of the rights and privileges or the influence by which the individuals of a state seek to determine or control its public policy. * * *" Webster's New International Dictionary (2d Ed. 1948) ("Political," meaning 3).

When we come to consider the meaning of Section 401(e) as a whole, it becomes apparent that Congress there sought to distinguish between acts performed in the interest of maintaining our own governmental institutions and acts which tend to support or implement institutions other than own own. The election in which plaintiff-appellee voted was the basic step toward the restoration of organized government of, by and for the German people.[7] As such, regardless of the fact that it was conducted under American auspices, in an area occupied by the American armed forces, and subject to American veto, it was a "political election in a foreign state" within the meaning of the statute.

No other court of appeals has to our knowledge had occasion to pass on the questions just considered as they relate to post-war Germany.[8] However, the Ninth Circuit has ruled that the elections of 1946–47 held under the auspices of the American military authorities in occupied Japan were "political elections in a foreign state," within the meaning of the Nationality Act. Acheson v. Kuniyuki, 9 Cir., 189 F.2d 741, rehearing denied 9 Cir., 190 F.2d 897, cer-

---

6. Memorandum prepared in the Department of State under date of Feb. 1, 1950, received as defendant's Exhibit No. 3 in the District Court. Plaintiff-appellee was qualified to vote because she had been a German citizen before 1939 and had not been a member of the Nazi party. She had dual nationality—German and American.

7. Cf. Gladstone: "What they [the Achaians] seem to have brought with them was the true political spirit; the faculty

of nation-making." Homer, vii, 100. Quoted in Murray, New English Dictionary, sub. "political."

8. Three district courts, however, have ruled that various post-war German elections were not within the purview of Section 401. Brehm v. Acheson, D.C.S.D.Tex., 90 F.Supp. 662; In re Riedner, D.C.E. D.Wis., 94 F.Supp. 289, 294; see Acheson v. Droesse, 90 U.S.App.D.C. ——, 197 F.2d 574, dismissing appeal as moot and vacating judgment of District Court.

tiorari denied 342 U.S. 942, 72 S.Ct. 554.[9] We reach a like conclusion here.

 Another point remains—that of duress. The complaint states that "Officers of the American Occupying Forces urged all eligible persons (particularly those opposed to Communism) to vote for delegates," and that plaintiff-appellee had "no knowledge" of Section 401(e) of the Nationality Act. These allegations are not sufficient to support summary judgment for plaintiff on the theory that she voted under duress. Acheson v. Kuniyuki, supra.[10] A person cannot avoid the consequences which Congress has attached to his overt acts by claiming ignorance of the law or a contrary intention on his own part in performing those acts, even though loss of citizenship is the result. Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287. But we believe that plaintiff-appellee should be given an opportunity to amend her complaint, if she can, so as to allege and prove any circumstances indicative of actual duress or entrapment. Cf. Moser v. United States, 341 U.S. 41, 46–47, 71 S.Ct. 553, 95 L.Ed. 729.

Linked to plaintiff-appellee's claim of duress is her contention that under the circumstances she could not be constitutionally deprived of her citizenship. Further development of the facts may perhaps provide a foundation for this contention. Certainly, on the present record, there is none.[11] See Savorgnan v. United States, supra; Mackenzie v. Hare, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297.

The judgment of the District Court will be

Reversed, and the case remanded for proceedings not inconsistent with this opinion.

9. The opinion expressly approves the holdings in Kuwahara v. Acheson, D.C. S.D.Cal., 96 F.Supp. 38, and Uyeno v. Acheson, D.C.W.D.Wash., 96 F.Supp. 510, and expressly disapproves the contrary holdings in nine district court decisions in the Ninth Circuit.

10. In addition to the cases on duress cited in the Kuniyuki opinion, see Nakashima v. Acheson, D.C.S.D.Cal., 98 F.Supp. 11; Cantoni v. Acheson, D.C.N.D.Cal., 88 F. Supp. 576; Kazdy-Reich v. Marshall, D.C.D.C., 88 F.Supp. 787; cf. Podea v. Acheson, 2 Cir., 179 F.2d 306; Acheson v. Murakami, 9 Cir., 176 F.2d 953; Doreau v. Marshall, 3 Cir., 170 F.2d 721; Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860.

11. A like contention was made in the Kuniyuki case, in which certiorari was denied March 3, 1952, 342 U.S. 942, 72 S.Ct. 554; the Court of Appeals for the Ninth Circuit rejected the argument without discussing it in its opinion. In Murata v. Acheson, D.C., 99 F.Supp. 591, and Okimura v. Acheson, 99 F.Supp. 587, the District Court for the District of Hawaii held certain subsections of Section 401 unconstitutional on the ground that Congress lacked the power to deprive native-born Americans of their citizenship for any cause other than naturalization in a foreign state. The judgments in both these cases were vacated by the Supreme Court on January 2, 1952, and the cases were remanded for specific findings by the District Court on the question of duress. 342 U.S. 899, 72 S.Ct. 293; 342 U.S. 900, 72 S.Ct. 294.