**Petition of KUTAY.**
**No. 153025.**

United States District Court
S. D. California, Central Division.
May 28, 1954.

Ronald L. Walker, Los Angeles, Cal., for petitioner.

Herman R. Landon, Dist. Director, Los Angeles Dist., by Samuel Hozman, Naturalization Examiner, U. S. Department of Justice, Los Angeles, Cal., for Immigration and Naturalization Service.

TOLIN, District Judge.

This matter concerns the petition of Tevfik Kutay who seeks to become a citizen of the United States. The Immigration and Naturalization Service opposes the petition.

Only one ground of objection is urged. There has not been any suggestion that any additional ground exists. The one objection is that petitioner is barred from citizenship because of the provision of the Immigration and Naturalization Act, Sec. 315, Title 8 U.S.C.A. § 1426 (a).[1]

---

1. *"Citizenship denied alien relieved of service in armed forces because of alienage; conclusiveness of records*
   *"(a) Notwithstanding the provisions of* section 405(b) of this Act, any alien who applies or has applied for exemption or discharge from training or service in the Armed Forces or in the National

Petitioner first entered the United States as a student in 1939. He was then a citizen of Turkey, traveling on a Turkish passport. The entry was formal and lawful. While in this country he remained in close association with, and was rather strictly governed by, the Turkish Consulate. After study of the English language at a Massachusetts' college, Petitioner matriculated in the University of California at Berkeley where he received a degree in architecture in 1945. Petitioner was in continual attendance at school during the academic year except for the fall semester of 1943. The time so lost was made up in the summer of 1944, so that he completed his studies within the usual period of time. In early 1943, petitioner married a citizen of the United States and at present has two children, both native-born citizens of the United States. Petitioner returned to Turkey in 1946 with the intention of remaining there. In 1948, after a change of mind, he returned to this country and applied for permanent residence. His application was rejected. Petitioner was then granted the benefit of a private law by the Congress admitting him for permanent residence as of his original entry in 1939.[2]

There is no suggestion of any reason petitioner would not make a good citizen of this country. The probability of his being a good citizen here is greater than in the average case and, in any event, his right to permanently reside within this Nation has become fixed by the Legislative and Executive Branches of the National Government, the Congressional enactment having obtained Presidential approval.

It is highly desirable in the form of government prevailing in this Nation that those who permanently reside here should shoulder the very real responsibilities of government which execution of the democratic principle entails. Naturalization is an entry upon the purpose to discharge many duties which fall to those who enter into citizenship status. Out of the new relationship spring more responsibilities than immediate personal benefits (particularly in this case, for Kutay's right to permanent residence has become fixed) but there is not yet a duty to vote or to serve in the various civilian ways in which the Nation sometimes commands its citizens. A good citizen is not merely one who lives in order, with abstinence from criminality. The individual citizen is the smallest individual unit of government and by virtue of his status as a national here, has the duty to collaborate in suffrage and other governmental duties. The petition is opposed solely upon the basis that, in 1944, petitioner signed an application for exemption from military service on the ground that he was a citizen of a neutral country. The exemption was granted. The Government now contends that, on these facts, petitioner is permanently ineligible for naturalization, although eligible to receive the protection of residence here with its incidents of protection by the agencies of government which, according to the Naturalization Service theory, he can never serve in responsible or nominal capacity. It is true that military service might again be commanded; but if this petition be denied, even that onerous concomitant of receiving protection cannot always be insisted upon, for the resident alien can, under some circumstances, still have the exemption Kutay obtained when he was exempted from military service. However, if this petition be granted, he will be responsible

Security Training Corps of the United States on the ground that he is an alien, and is or was relieved or discharged from such training or service on such ground, shall be permanently ineligible to become a citizen of the United States."

2. The bill, as originally presented, contained a provision making petitioner eligible for citizenship. This provision was stricken before the bill was passed. However, this fact is considered of no consequence in relation to this action. At most, it was a Congressional Committee action in refusing to frame its recommended bill as suggested by the sponsor of the bill.

for all the burdens as well as enjoy all the advantages of citizenship.

The statute provides that any alien who applies for, and receives, such an exemption shall be permanently ineligible to become a citizen of the United States. Immigration and Naturalization Act, Sec. 315, Title 8 U.S.C.A. § 1426 (a).[3] The suggestion has been made that this ineligibility provision does not apply to petitioner here since at the time he claimed the exemption, he was merely a temporary visitor and not a permanent resident. It is argued that the claim by such an alien (as in the case of a foreign tourist) should not have the extreme and excluding consequences applied to an alien who makes his permanent residence in this country and, hence, enjoys many more benefits and protections. Such permanent resident invariably has lost the immediate responsiveness to the dictates of his national government. The equities of this argument are very compelling. A forceful presentation might well be made that it was not the Congress' intention to impose this harsh penalty on mere temporary visitors who are not here as immigrants or residents with the intention of making their home here, but rather are present on limited business or pleasure ventures and maintain a close association and amenability to the discipline of their native country and have an honest intention of returning there on completion of their mission. Such a class of aliens are generally, if not always, subject to the military service of their own country and cannot equitably be classified with those non-citizens who seek the privileges and protection of this country as a permanent home and yet seek to avoid their correlative duties and obligations. A citizen of one country might well be *required* by his government to resist, by all possible means, conscription into another country's military service. This is nothing novel or new. The Supreme Court has recognized the principle in Harisiades v. Shaughnessy, 342 U.S. 580, at pages 585–587, 72 S.Ct. 512 at page 516, 96 L.Ed. 586, where it was said,

"So long as one thus perpetuates a dual status as an American inhabitant but foreign citizen, he may derive advantages from two sources of law—American and international. He may claim protection against our Government unavailable to the citizen. As an alien he retains a claim upon the state of his citizenship to diplomatic intervention on his behalf, a patronage often of considerable value. The state of origin of each of these aliens could presently enter diplomatic remonstrance against these deportations if they were inconsistent with international law, the prevailing custom among nations or their own practices.

"The alien retains immunities from burdens which the citizen must shoulder. By withholding his allegiance from the United States, he leaves outstanding a foreign call on his loyalties which international law not only permits our Government to recognize but commands it to respect. In deference to it certain dispensations from conscription for any military service have been granted foreign nationals. They cannot, consistently with our international commitments, be compelled 'to take part in the operations of war directed against their own country.' In addition to such general immunities they may enjoy particular treaty privileges.

"Under our law, the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen. Most importantly, to protract this ambiguous status within the country is not his right but is a matter of permission and tolerance. * * *"

A.Appendix, § 303(a).

---

3. See similar provisions in Selective Training and Service Act of 1940, 50 U.S.C.

Our own nation makes similar requirements of its citizens. See Title 8 U.S.C.A. § 1481(a)(3); Bauer v. Clark, 7 Cir., 161 F.2d 397; Minoru Hamamoto v. Acheson, D.C.S.D.Cal., 98 F.Supp. 904, Byrne; Federici v. Miller, D.C.W.D. Pa., 99 F.Supp. 962. It seems to be only elementary fairness to require a person to render military assistance to only one country, and that such country should normally be that nation of which he is a citizen.

■■ The group of *resident* aliens who have *moved* here as distinguished from visiting students is always very large. In 1952, 265,520 *resident aliens were admitted,* whereas the *student visitors temporarily here* on special limited visas numbered only 13,533.[4] It might well have been that, as suggested, the Congress overlooked the latter group because of comparative and actual smallness of number, but the Court must always respect and enforce that which the Congress has enacted into law, rather than what it might have legislated had it been more fully informed or its attention drawn to a particular situation. The critical Section involved here [5] speaks clearly of " * * * any alien * * " and "alien" is specifically defined in the Act as any person not a citizen or national of the United States,[6] and hence, the ban clearly would apply to persons in the class of Petitioner here.

The Supreme Court has, however, declared a very definite limitation on these military exemption waivers. In the case of Moser v. United States,[7] an alien was informed by his legation that signing the application for exemption [8] would not absolutely foreclose his right to apply for citizenship. The court there held, with the following language in 341 U.S. at page 47, 71 S.Ct. at page 556, that the petitioner could obtain citizenship:

" * * * Petitioner did not knowingly and intentionally waive his rights to citizenship. In fact, because of the misleading circumstances of this case, he never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness. Johnson v. United States, 318 U.S. 189, 197, 63 S.Ct. 549, 553, 87 L.Ed. 704. To hold otherwise would be to entrap petitioner."

Several subsequent cases have cited the Moser decision, either following [9] or distinguishing [10] that case from the case before the court. The case before this Court now can clearly be distinguished from any of these subsequent cases on the facts. However, the decision here necessarily indicates that this Court does not agree with some of the interpretations given the pronouncements of the Moser case in those cases where courts have sought to distinguish it. It is this Court's opinion that the decision here squares with the language and spirit of the Moser case. There admittedly is a material difference between the fact situation here and that in the Moser case. There, the petitioner did not realize or understand that he was waiving his right to citizenship but rather was under the impression that his claiming the exemp-

4. Annual Reports of the Immigration & Naturalization Service 1952–1953.

5. Title 8 U.S.C.A. § 1426(a).

6. Title 8 U.S.C.A. § 1101(a) (3).

7. 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729.

8. The form involved differed from the one in the instant case in that the notice of debarment was in a footnote rather than in the body of the form.

9. Machado v. McGrath, 89 U.S.App.D.C.

70, 193 F.2d 706; Petition of Berini, D. C.E.D.N.Y., 112 F.Supp. 837.

10. Acheson v. Wohlmuth, 90 U.S.App.D. C. 375, 196 F.2d 866; Revedin v. Acheson, 2 Cir., 194 F.2d 482; Petition of Miranda, D.C.E.D.N.Y., 111 F.Supp. 481; Barreiro v. McGrath, D.C.N.D.Cal., 108 F.Supp. 685; Application of Mannerfrid, D.C.S.D.N.Y., 101 F.Supp. 446. See also, Acheson v. Mariko Kuniyuki, 9 Cir., 189 F.2d 741; In re Ballester, D.C.Puerto Rico, 119 F.Supp. 629.

tion in no way impaired that right.[11] Hence, he did not know the usual result of the act he was about to take but was misinformed as to the state of the laws. Here, the petitioner admits that he knew and understood the result of his signing the exemption form. His contention (amply supported by evidence) rather is that he did not believe he had any free choice in the matter. In spite of this difference, the Court feels that the situation here is within the scope, language and theory of the Moser case, which this Court regards as the controlling decision.

The evidence, as adduced from petitioner's testimony and the documentary evidence produced, indicates, without contradiction, that at the time he signed the form, petitioner was a Turkish national, traveling on a Turkish passport. Upon arriving in this country, petitioner was required to immediately check in at the Turkish Consulate where his passport was taken up and a certificate of nationality issued, which had to be periodically renewed. He was under contract to the Turkish Government to obey all their regulations with regard to his activities in this country and, apparently, not raise any jurisdictional objections to any action they sought against him. His choice of educational institutions was subject to approval of the Consul's office. There is evidence that some of the Turkish students, and possibly petitioner here, were living, at least partially, on subsistence from the Turkish Government. Within recent years education has frequently encouraged students of one nation to visit in another nation during part of their upper school and college life. Apparently there were several students here from Turkey at the pertinent time, petitioner being but one of several all of whom were beneficiaries of their nation's bounty, at least to the extent of granting them participation in the visit, and all subject to respectful obedience to their sovereign who coupled its bounty with strict control of the beneficiaries. Petitioner was temporarily excused from military service in Turkey due to his student's status, but he had to periodically renew his deferment. He was required to submit his grades to the Consul every semester, and his stay in this Nation was subject to his maintaining a certain standard of scholastic attainment. Periodic reports to Turkish authority were required. Any change of address had to be reported and frequent changes were discouraged. Petitioner was *forbidden* by Turkish authority to drive a car until he obtained his graduate degree, and was under directions to write to his family at least every fifteen days. Petitioner's obligations and activities in relation to the American Selective Training and Service System were set out in detail.

Under these circumstances, petitioner was notified by the American draft board that he had been reclassified and that he must register as a person subject to the draft. Indicative of his lack of freedom, he contacted the Turkish Consul for information and instructions. He was notified by telegram, "Present yourself to the draft board. Obtain form 301 and sign it." Petitioner testified that he considered the telegram a clear directive and that certain rather severe consequences would be imposed by the Turkish Government if he disregarded the instructions. The question was asked of petitioner:

"Q. Did you feel in your mind, Mr. Kutay, that you had any choice whether you could or could not sign such a form? A. None at all at that time, sir. As a matter of fact, I presented the telegram even to the clerk at the Draft Board and translated it to her. She even felt there was no choice for me at that time."

The language of the telegram was clearly a directive, and not merely the giving

---

11. Several subsequent cases have indicated, while citing the Moser case, that understanding and intent were immaterial in similar situations. See, Revedin v. Acheson, supra; Acheson v. Wohlmuth, supra. Also see, Acheson v. Mariko Kuniyuki, supra. We emphatically cannot agree with such an interpretation of the Moser case.

of advice or suggestion. The witness admitted he considered the consequences of not being able to become a United States citizen, but felt that to disregard the telegram would be to definitely disobey the Turkish law. At that time he thought of himself as permanantly subject to that law. He later was asked, on cross-examination:

"Q. Did you feel you were signing this document under compulsion of the Turkish Government? A. Definitely under their direction. * * *."

The witness emphasized that

"The telegram did not have any wording of choice."

■ This Court accepts petitioner's testimony as true. Thus, it is apparent that petitioner did not have the opportunity to make an intelligent election. He was an alien under allegiance to a foreign, neutral government, temporarily in this country for a limited purpose. His action was on direction of his sovereign. He was under obligation to obey that sovereign. International law might well require our Government to respect petitioner's loyalties to his sovereign. See comments in Harisades v. Shaughnessy, 342 U.S. 580, 585–586, 72 S.Ct. 512, 96 L.Ed. 586; See also, 4 Moore International Law Digest, 52–53, 61. In any event, taking these facts as true, this Court must conclude that the situation of petitioner fits well within the rule set forth in the Moser case, and that petitioner had no "opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law." The "intelligent waiver" required by "elementary fairness" was not present and, hence, the signing of the form was of no effect in barring him from citizenship.

Petitioner was in a position somewhat like that of guardian and ward, his position being analogous to that of ward, the Government of Turkey to that of guardian. Wards do not have a freedom of choice except as the guardian allows it. The Moser case refers to "knowingly" and "intentionally" as elements with which the act must be done in order to raise the bar. The case then says that an "intelligent" election is necessary. Intelligence implies something more than knowledge. It requires some element of personal freedom of appraisal of the situation. Webster's New International Dictionary, Second Edition, includes in its definition of "intelligence" "the power of meeting a novel situation successfully by adjusting one's behaviour to the total situation". While it is easy to reason that a resident alien, here for permanent residence, free from immediate personal supervision of the country of his nationality, would be able to exercise that quality of "adjusting one's behaviour to the total situation", it is also clear that the guardian-like power, strictly exercised by Turkey in this case, prevented petitioner from exercising the freedom of choice inherent in the Supreme Court's requirement that the waiver be intelligently exercised.

Thus disposing of the objections to the petition, it is not necessary to consider the further ground offered in avoidance of the effect of petitioner's signing of the critical form.[12]

Petition granted.

Petitioner's counsel will prepare appropriate findings, conclusions and order which shall provide that on any judicial day following the order becoming final, petitioner may appear in this Court and be admitted to citizenship.

12. Petitioner further alleges that his classification by the draft board as a resident, was erroneous, and argues that this Court can now re-determine that issue. In support of this argument, petitioner relies on McGrath v. Kristensen, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173.