**Beys AFROYIM, Plaintiff,**

v.

**Dean RUSK, as Secretary of State, Defendant.**

United States District Court
S. D. New York.
Feb. 25, 1966.

American Civil Liberties Union, New York City, for plaintiff; Nanette Dembitz, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, for defendant; James G. Greilsheimer, Sp. Asst. U. S. Atty., of counsel.

FREDERICK van PELT BRYAN, District Judge:

In this declaratory judgment action plaintiff, who has lost his American citizenship under § 401(e) of the Nationality Act of 1940, 8 U.S.C. § 1481(a)

(5), challenges the constitutionality of that section.

█ While it does not appear whether plaintiff was within the United States when the action was commenced, there is jurisdiction in any event. If he was, this court has jurisdiction under § 360 (a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1503(a). If he was not, this court has jurisdiction under § 10 of the Administrative Procedure Act, 5 U.S.C. § 1009, as implemented by the Declaratory Judgment Act, 28 U.S.C. § 2201. See Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962).

Both parties have cross-moved for summary judgment on stipulated facts pursuant to Rule 56(a), (b), F.R.Civ.P.

Plaintiff was born in Poland in 1893, and emigrated to the United States in 1912. He became a naturalized citizen in this court on June 14, 1926.

Some time during 1950 the plaintiff emigrated to Israel. He resided there some ten years, pursuing his profession as an artist. By his residence in Israel plaintiff apparently has acquired Israeli citizenship, though the parties have not argued the question here. There has been no claim by the plaintiff that the deprivation of his American citizenship will render him a stateless person.

On November 14, 1960, in preparation for a return to this country, plaintiff applied to the United States Consulate in Haifa for a passport. His application was rejected, and the American Vice Consul issued a Certificate of Loss of Nationality to plaintiff on the ground that he had expatriated himself on July 30, 1951, by casting a ballot in a political election in a foreign state in contravention of § 401(e).[1] The Vice Consul's action was approved by the Passport Office of the Department of State on January 4, 1961. Plaintiff appealed to the State Department's Board of Review on the Loss of Nationality which affirmed the Vice Consul's determination on May 3, 1965. This action followed.

Throughout the administrative proceedings plaintiff contended that he had never voted in an election of the State of Israel, but only entered the polling place to sketch the voters as they cast their ballots. Before this court, however, it is stipulated that on July 30, 1951, plaintiff voted in the elections for the Second Knesset, the Parliament of the State of Israel. And it is agreed that he did so voluntarily.[2]

Plaintiff contends that at no time did he intend to abandon his American citizenship. Defendant refuses to stipulate that this allegation is true or false, but urges that in any event it is immaterial for purposes of deciding the case at bar.

It has been said with good reason that the "[v]iews of the Justices have varied when it comes to the problem of expatriation." Schneider v. Rusk, 377 U.S. 163, 166, 84 S.Ct. 1187, 1189, 12 L.Ed.2d 218 (1964). Under these circumstances the task of a District Court, charged with applying the law as declared by the Supreme Court of the United States, is not without its difficulties.

The decision in Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), is directly called into question by the plaintiff in the case at bar. There the Supreme Court by a 5–4 vote squarely upheld the constitutionality of § 401 (e) as a proper incident of the power of

---

1. 8 U.S.C. § 1481(a) (5) reads as follows: "From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

\* \* \* \* \*

"(5) voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory;

\* \* \* \* \*."

2. The effect of this stipulation is to remove the oft-litigated issue of duress from the case at bar. See, e. g., Tanaka v. Immigration & Naturalization Service, 346 F.2d 438 (2 Cir. 1965); Takehara v. Dulles, 205 F.2d 560 (9 Cir. 1953); Acheson v. Mariko Kuniyuki, 189 F.2d 741 (9 Cir. 1951), cert. den., 342 U.S. 942, 72 S.Ct. 554, 96 L.Ed. 701 (1953); Doreau v. Marshall, 170 F.2d 721 (3 Cir. 1948).

Congress to regulate foreign affairs; the statute was applied—despite Fifth and Fourteenth Amendment objections—to a natural born American citizen who had voted in political elections in Mexico. Plaintiff candidly concedes that *Perez* would be controlling here, were it not, as he urges, that the vitality of that decision has been so completely undermined by subsequent cases that it no longer has the force of law. I am fully conversant with the speculation to the effect that the Supreme Court in recent years has *sub silentio* overruled *Perez*,[3] but in my view that case is still a precedent binding on this court.

The issue posed by Justice Frankfurter in *Perez*—and restated as the controlling question by Justice Douglas in the recent case of Schneider v. Rusk, supra, 377 U.S. at 166, 84 S.Ct. 1187—is whether "the means, withdrawal of citizenship, [is] reasonably calculated to effect the end that is within the power of Congress to achieve, the avoidance of embarrassment in the conduct of our foreign affairs." 356 U.S. at 60, 78 S.Ct. at 577. In *Perez* the court answered that question in the affirmative as to § 401(e), finding that it was the "possession of American citizenship" that made the act of voting in a foreign political election "potentially embarrassing to the American Government and pregnant with the possibility of embroiling this country in disputes with other nations." Ibid. It was therefore held that Congress could provide for termination of citizenship so as to eliminate the problem.

*Perez* also flatly rejected the contention that a person, voting abroad in a foreign political election, must intend to give up his citizenship before it may be taken away. Whether § 401(e) requires a purposeful abandonment of citizenship is simply a matter of statutory interpretation which is closed in this court by the *Perez* decision.[4] In any event, Justice Frankfurter's interpretation is supported by the intent and the plain meaning of the statute as well as by precedent.[5] And it is sustained by reason. Indeed, if, as *Perez* holds, it is the foreign affairs power which supports deprivation of citizenship under § 401(e), then Congress quite justifiably can attach a loss of citizenship for voting in a foreign political election without regard to the voter's intent. It is the "possession of American citizenship" by the voter, not the state of his mind, which poses a hazard to the conduct of our international relations. For example, participation by Americans in the plebiscite to determine sovereignty over the Saar—activity which was the immediate catalyst for the passage of § 401(e)—did not hamper the conduct of foreign affairs any the less because some of those voting may have had no intention of abandoning their American citizenship.

Since *Perez* is direct authority against plaintiff on the question presented here, the function of this court is only to determine whether the vitality of that decision

---

3. See, e. g., Tanaka v. Immigration & Naturalization Service, 346 F.2d 438, 447–448 n. 3 (2 Cir. 1965) (Kaufman, J., dissenting); Agata, Involuntary Expatriation and Schneider v. Rusk, 27 U.Pitt. L.Rev. 1 (1965); Kurland, Foreword: Equal in Origin and Equal in Title to the Legislative and Executive Branches of the Government, 78 Harv.L.Rev. 143 (1964).

4. Certainly it cannot be said that intent must necessarily be included as an element of § 401(e) in order to save its constitutionality. There is even a serious question as to whether the Constitution in any significant degree forbids *criminal* punishment for unintentional conduct.

See Shevlin-Carpenter Co. v. State of Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L. Ed. 930 (1910); Packer, Mens Rea and the Supreme Court, 1962 Sup.Ct.Rev. 107. Much less would it prohibit the application of § 401(e)—which is non-penal in nature, see p. 689 infra—to an actor who was unaware of the consequences of his conduct.

5. E. g., Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950); Mackenzie v. Hare, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297 (1915); Acheson v. Mariko Kuniyuki, 189 F.2d 741 (9 Cir. 1951), cert. den., 342 U.S. 942, 72 S.Ct. 554, 96 L.Ed. 701 (1952).

has survived. The four Justices who dissented in *Perez* joined in the opinion of the Court in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), which held unconstitutional a statute denationalizing any citizen who had been convicted of desertion by a court-martial. One Justice concurred on a separate ground. Four others dissented. Unconstitutionality, in the opinion of the Court, rested upon: (1) a total inability of Congress to effectuate a deprivation of citizenship except on voluntary renunciation, and (2) the cruel and unusual punishment clause of the 8th Amendment. Neither factor has significance here.

 As to the first ground, the view that Congress is incapable of accomplishing involuntary expatriation has simply "not yet commanded a majority of the entire Court." Schneider v. Rusk, supra 377 U.S. at 166, 84 S.Ct. at 1189. The second ground in *Trop*, the cruel and unusual punishment clause, is inapplicable to the case at bar because § 401(e) is non-penal in nature. Justice Frankfurter concluded in *Perez* that the statute was designed to prevent intentional or unwitting interference with the foreign relations of the United States by an American citizen abroad. The purpose of the statute, he held, was regulation, not punishment.

It was for this reason that the mere casting of a ballot in a foreign political election—conduct on its face quite harmless or even commendable—was deemed to be sufficient to trigger the drastic and irremediable sanction of forfeiture of citizenship. Thus *Trop* cannot be said to undermine *Perez*. It is not open for plaintiff to contend here that § 401(e) is in essence a penal law passed in a spirit of vindictiveness, and must satisfy constitutional standards more stringent than those applied in *Perez*.

The holding in *Perez* that § 401(e) is non-penal in nature also distinguishes the present case from the two decisions in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The Supreme Court there invalidated §§ 401(j) and 349(a) (10) of the Nationality Act of 1952 "because in them Congress [had] plainly employed the sanction of deprivation of nationality as a punishment—for the offense of leaving or remaining outside the country to evade military service—without affording the procedural safeguards guaranteed by the Fifth and Sixth Amendments." Id. at 165–166, 83 S.Ct. at 566. *Perez*, however, was considered by the Court to be distinguishable because § 401(e) was supported by "legislative history totally different from that underlying §§ 401(j) and 349(a) (10)." Id. at 164, 83 S.Ct. at 565; see id. at 170, 83 S.Ct. 554 n. 30. Thus the reservation in *Mendoza-Martincz*, rather than the decision, is instructive here.

In addition to contending that *Perez* has been in effect overruled by recent cases, plaintiff directly assails the reasoning of that decision. He attacks the wisdom—and even the rationale—of a statute which presumes that an American citizen by merely voting in a foreign political election could involve this country in international difficulties. He challenges the conclusion in *Perez* that "[t]he citizen may by his action unwittingly promote or encourage a course of conduct contrary to the interests of his own government," 356 U.S. at 59, 78 S. Ct. at 576, because any citizen may do that simply by voting in this country for a candidate who turns out badly or by exercising his rights of free speech at home or abroad. Plaintiff seeks to discount any danger in the possibility that the "people or government of the foreign country may regard [the voter's] action" to be a "reflection if not an expression" of the policy of the United States, ibid, because the same likelihood obtains whenever an American citizen abroad expresses his views on any matter of political import.

 Plaintiff's attacks upon § 401 (e) and upon these isolated observations in the *Perez* opinion are not wholly unpersuasive. But in the delicate field

of constitutional adjudication a court is not called upon to pass on the wisdom or the efficacy of a statute; the question is only "whether or not Congress may have concluded not unreasonably that there is a relevant connection between [the] fundamental source of power and the ultimate legislative action." Id. at 58, 78 S.Ct. at 576. *Perez* found a sufficient connection. It is not within the province of this court to overrule that conclusion. Suffice it to say that *Perez*, read as a whole, holds that the Constitution does not deny Congress the power to prevent American citizens from engaging in the processes of political decision in a foreign state, regardless of whether our government is interested one way or another in the specific outcome of the election or interested only in maintaining an appearance of circumspect neutrality. *Perez* confirmed a Congressional power to determine that the formulation of sensitive political decisions vitally important to a foreign state—and indirectly affecting the international community at large—should properly be conducted without the participation of American citizens.

Beyond this, Congress might well conclude that a citizen's voting abroad constituted conduct "inconsistent with undiluted allegiance to this country." Kennedy v. Mendoza-Martinez, supra, 372 U.S. at 214, 83 S.Ct. at 591 (Stewart, J., dissenting). As was said in Acheson v. Wohlmuth, 90 U.S.App.D.C. 375, 196 F. 2d 866, 870, cert. den., 344 U.S. 833, 73 S.Ct. 40, 97 L.Ed. 648 (1952):

> "the intent of Congress in the Nationality Act was to attach the consequence of loss of citizenship to conduct which substantially evidences allegiance to a government existing in a territory other than our own. * * * When we come to consider the meaning of Section 401

(e) as a whole, it becomes apparent that Congress there sought to distinguish between acts performed in the interest of maintaining our own governmental institutions and acts which tend to support or implement institutions other than our own."

Thus, if it is now the law that Congress may effectuate a withdrawal of the precious rights of citizenship only upon conduct evincing something less than full allegiance to this country, compare Schneider v. Rusk, supra 377 U.S. at 168, 84 S.Ct. at 1190 (Douglas, J.) with id, at 178, 84 S.Ct. at 1195 (Clark, J., dissenting), then § 401(e) satisfies that test. Indeed, the suggestion in *Perez* that in the opinion of Congress voting in a foreign political election could import "allegiance to another country" in some measure "inconsistent with American citizenship," 356 U.S. at 61, 78 S.Ct. 568 might well be the source of the doctrine which apparently gained a consensus of the Justices in *Schneider*.

■ In my view the authority of *Perez* v. *Brownell* still stands and is controlling here. This conclusion is in full accord with the decisions of the Second Circuit in which the vitality of *Perez* was at least collaterally challenged. Tanaka v. Immigration & Naturalization Service, 346 F.2d 438 (2 Cir. 1965); United States ex rel. Marks v. Esperdy, 315 F.2d 673 (2 Cir. 1963), aff'd by an equally divided court, 377 U.S. 214, 84 S.Ct. 1224, 12 L.Ed.2d 292 (1964). See also Rocha v. United States, 351 F.2d 523 (1 Cir. 1965), petition for cert. filed, 34 U.S.L.Week 3272 (U.S. Jan. 10, 1966).

Defendant's motion for summary judgment is granted. Plaintiff's oral cross-motion for the same relief is denied. Judgment will be entered accordingly.

It is so ordered.